**FLORIDA TOWING CORPORATION, a Florida Corporation, Plaintiff-Appellant,**

**v.**

**OLIVER J. OLSON & CO., a Corporation, Defendant-Appellee.**

No. 28336.

United States Court of Appeals, Fifth Circuit.

May 21, 1970.

George D. Gabel, Jr., Jacksonville, Fla., for plaintiff-appellant.

James E. Cobb, Mathews, Osborne & Ehrlich, Jacksonville, Fla., for defendant-appellee.

Before PHILLIPS,* BELL and SIMPSON, Circuit Judges.

PHILLIPS, Circuit Judge.

Florida Towing Corporation [1] brought this action against Oliver J. Olson & Co.[2] in the United States District Court for the Middle District of Florida to recover $15,000. Florida Towing undertook to make a service of process in the case on Olson, under Florida's long arm statute (F.S.A. § 48.181).[3]

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called Florida Towing.

2. Hereinafter called Olson.

3. F.S.A. § 48.181 reads as follows:

"(1) The acceptance by any person or persons, individually, or associated together as a copartnership or any other form or type of association, who are residents of any other state or country, and all foreign corporations, and any person who is a resident of the state and who subsequently becomes a nonresident of the state or conceals his whereabouts, of the privilege extended by law to non-residents and others to operate, conduct, engage in, or carry on a business or business venture in the state, or to have an office or agency in the state, constitutes an appointment by the persons and foreign corporations of the secretary of state of the state as their agent on whom all process in any action or proceeding against them, or any of them, arising out of any transaction or operation connected with or incidental to the business or business venture may be served. The acceptance of the privilege is signification of the agreement of the persons and foreign corporations that the process against them which is so served is of the same validity as if served personally on the persons or foreign corporations.

"(2) If a foreign corporation has a resident agent or officer in the state, process shall be served on the resident agent or officer.

"(3) Any person, firm or corporation which sells, consigns, or leases by any means whatsoever tangible or intangible personal property, through brokers, jobbers, wholesalers or distributors to any person, firm or corporation in this state

The facts, as reflected by an affidavit filed by Olson in support of its motion to quash the service and dismiss the action, counter-affidavits filed by Florida Towing, and certain written exhibits are these:

At all times here material, Olson was the owner of the "Barge Marguerita," [5] formerly "Mary Olson."

Olson is a California corporation, with its principal office in San Mateo, California, and branch offices in Long Beach, California, and Coos Bay and Portland, Oregon. Its principal business is the transportation of lumber and lumber products from the Pacific Northwest to Southern California, and the minor part of its business is the transportation of petroleum products from Southern California to the Pacific Northwest.

Florida Towing is a Florida corporation.

Near the end of the year 1966, Maxwell Harris, president of Maxwell Harris Company, Inc., and a broker in marine transportation, located in New York and Boston, contacted James W. Adams, a broker in marine transportation, whose office was in New Orleans, Louisiana, and who was president of Adams Marine Service, Inc.

Harris requested Adams to endeavor to find a buyer for Olson's "Barge Marguerita" on behalf of his West Coast contact, Charles Mathe, who was vice president of T. W. Wyatt Co., Inc.,[6] a ship broker located in San Francisco, California.

Harris gave Adams a description of the "Barge Marguerita" and forwarded "prints" of the Barge to him.

During the period from May 1967 through January 1968, Wyatt, apparently acting as broker for Olson through Harris, carried on negotiations for the sale of several of Olson's vessels to Gulf Atlantic Towing Corporation,[7] which had no connection with Florida Towing. Apparently, the "Barge Marguerita" was not involved in the transactions with Gulf Atlantic, as it was only casually mentioned once in a letter dated May 11, 1967, from Harris to Gulf Atlantic, and is not again mentioned in the correspondence between Harris and Gulf Atlantic during the period above mentioned.

In his affidavit, Adams averred that "[o]ver a period of about two years," he "discussed the barge at various times with * * * W. T. Coppedge, President of Florida Towing Corporation, in Jacksonville, Florida, and, finally in August 1968," Adams "was able to interest him in looking into possibly purchasing the barge." However, Adams lacked sufficient information to properly describe the Barge to Coppedge. To obtain that information, Adams went to San Francisco in August 1968 and contacted Mathe, who introduced him to Whit Olson, vice president of Olson. Whit Olson gave Adams part of the information he desired and asked J. Dillen, a surveyor who surveyed the Barge in 1968 in behalf of Olson, to give Adams an estimate of the approximate cost to put the Barge in condition to obtain certification of it by the United States Coast Guard and the American Bureau of Shipping. Dillen gave Adams an estimate therefor of $28,000.

Neither Whit Olson nor any other representative of Olson gave Adams the price for which it was willing to sell the

---

shall be conclusively presumed to be operating, conducting, engaging in or carrying on a business venture in this state."

4. The provisions of subsections (1) and (2) of § 48.181, as set forth above, were written into the Florida long arm statute by an amendment in 1951.

Subsection (3), as set forth above, was added by an amendment in 1957.

And a 1967 amendment renumbered the section as 48.181. See "History and Source of Law" under § 48.181, F.S.A. 1967, Vol. 2, at page 265.

5. Sometimes hereinafter referred to as the Barge.

6. Hereinafter called Wyatt.

7. Hereinafter called Gulf Atlantic.

Barge or the terms upon which it was willing to sell it, or indicated that they were listing the Barge for sale by Adams as its broker.

With the information he obtained, Adams was able to induce Coppedge, in behalf of Florida Towing, to submit an offer to purchase the Barge and three cranes for $125,000.

On or about November 7, 1968, Adams, "on behalf of Florida Towing" made an oral offer to Wyatt to purchase the Barge and the three cranes for $125,000.

That offer was confirmed by a telegram which read:

"NEW ORLEANS LA. 7 313 PCST
MATHE, T W WHATT CO.
405 MONTGOMERY ST. S FRAN

THIS IS CONFIRMING OFFER BY W T COPPEDGE FLORIDA TOWING CORP. TO PURCHASE MARY OLSON WITH THREE CRANES FOR $125,000 AS IS WHERE IS IN SAN FRANCISCO SUBJECT TO DRY DOCKING AND APPROVAL OF BOTTOM BY COAST GUARD AND A V S. DRY DOCK COST FOR ACCOUNT OF SELLER IF NOT APPROVED AND BUYER IF APPROVES. OFFER TO HOLD FIRM UNTIL NOON TUESDAY NOV. 12TH.

FLORIDA TOWING
BY J W ADAMS"

The terms of the offer were not acceptable to Olson and on November 8, 1968, by telegram addressed to Adams, Olson made a counteroffer, in which it offered to sell the Barge to Florida Towing on the following terms:

"1. Buyer shall deposit $25,000 down payment with seller by close of business Tuesday, November 12.

"2. Seller shall arrange dry-docking. If hull found damaged, seller shall have option and reasonable opportunity to repair it. If satisfactory repairs impossible, down payment shall be returned. If bottom approved by Coast Guard and American Bureau of Shipping without repairs or after necessary repairs, buyer shall pay dry-docking cost. If bottom not approved, seller shall pay dry-docking. Surveys at cost of buyer.

"3. All equipment affixed to the vessel shall be included and three unit cranes, two located at Manitou Equipment Company and one at E. H. Bean Company, Red Wood City.

"4. Except for possible repair of bottom damage provided for above sale shall be on an as-is where-is basis.

"5. Title shall be transferred and documents furnished through Wells Fargo Bank, 464 California Street, San Francisco, and balance of purchase price shall be paid to Wells Fargo Bank for account of seller, the transaction to be closed within three days following conclusion of dry-docking."

On November 11, 1968, Florida Towing sent a letter to Olson, accompanied by its check for $15,000 as a down payment, and indicated the terms proposed were acceptable to it, provided the down payment was reduced to $15,000. Olson accepted and cashed the check, and thereby agreed to the reduction proposed by Florida Towing.

In its complaint, Florida Towing alleged that Olson advised Florida Towing that it had ordered dry-docking of the Barge on the morning of December 23, 1968, for Florida Towing's inspection; that its inspection of the Barge on December 23 and 24, 1968, revealed that it would cost in excess of $100,000 to obtain certification by the American Bureau of Shipping and the Coast Guard; that it had relied on Olson's surveyor's estimate of $28,000, and that Olson had failed and neglected to obtain such certification, and that on December 28, 1968, by telegram to Olson, Florida Towing demanded the return of its $15,000 down payment.

In support of its motion, Olson filed an affidavit by its vice president, John E. Pettebone, in which he averred:

That Olson never had at any time in Florida a place of business, an office, mailing address, telephone service, or other means of communication; that it never had in Florida at any time an employee, agent, representative, broker, salesman or any other person acting in its behalf; that Olson never at any time sold products in Florida, directly or indirectly, or through wholesalers, jobbers or other distributors, and that it never at any time advertised any products or services or solicited any business in Florida from any persons, firms or corporations within that state.

■ Unless an acceptance is unconditional and without variance from the offer, in legal effect it is not an acceptance, but is a counteroffer.[8]

Here, Florida Towing's acceptance of Olson's counteroffer was in variance therewith, in that Florida Towing tendered a down payment of $15,000, instead of $25,000 stipulated in Olson's counteroffer.

■ A contract is made at the time the last act necessary for its formation is done and at the place where it is done.[9]

Here, such last act was the acceptance by Olson of Florida Towing's check for $15,000 as the down payment.

■ From the facts stated above, it will be seen that the contract was one to sell and not of sale; that it was not fully carried out, and no sale was ever consummated thereunder; that by the terms of the contract the dry-docking and the repairing, if any was necessary, of the bottom of the Barge; the security of the approvals, the payment of the balance of the purchase price; the delivery of the Barge and cranes, and the passing of title were all to take place in San Francisco, California.

Hence, the contract was made and was to be performed in California and the alleged wrongful acts of Olson, relied on by Florida Towing as the basis for its claim that it was relieved from further performance of the contract and was entitled to the return of the $15,000 down payment, all took place in California.

It is clear that Olson did not sell any property in Florida, because the contract was one to sell and not of sale, and Olson did not secure the approvals upon which the obligation to purchase was conditioned, the balance of the purchase price was not paid, the Barge was not delivered, and the title thereto did not pass to Florida Towing.

In Zirin v. Charles Pfizer & Co., Fla., 128 So.2d 594, 600, the Supreme Court of Florida held that the Florida long arm statute was intended to apply to a Florida corporation with respect only to obligations or causes of action which arose out of the activities of such corporation in Florida, and that the burden of proof is upon the party who relied on service under such Florida long arm statute to show "that the cause of action upon which he sues is one which arose out of the activities of the foreign corporation within this State."

And in Young Spring & Wire Corp. v. Smith, Fla., 176 So.2d 903, 905, the Supreme Court of Florida held with respect to the Florida long arm statute that "one seeking to effect service under it has the burden of presenting facts which clearly justify its applicability."

In his affidavit Pettebone averred that Olson "never had an employee, agent, representative, broker salesman or any other person, firm or corporation representing it or acting on its behalf in the State of Florida."

The oral offer of Florida Towing to purchase the Barge and the telegraphic confirmation thereof were transmitted from New Orleans by Adams, and, as

8. Peerless Casualty Co. v. Housing Authority, 5 Cir., 228 F.2d 376, 378.

9. Don J. Cummings Co. v. Aluminum Manufacturing Corp., 10 Cir., 371 F.2d 118, 120.

averred in Adams's affidavit, were done by him, acting for Florida Towing.

The only basis for claiming that Adams, in soliciting Florida Towing to purchase the Barge and inducing it to make an offer of purchase, was acting as the authorized broker of Olson, was the fact that Wyatt acted as broker for Olson; that Wyatt contacted Harris and Harris contacted Adams and requested the latter to endeavor to locate a buyer for the Barge.

We think it doubtful that Florida Towing met the burden [10] of proving that Adams ever acted as Olson's broker in Florida.

However, assuming, but not deciding, that Adams acted as broker for Olson in Florida in procuring Florida's Towing's offer to purchase the Barge and in transmitting it to Wyatt, we are of the opinion that Florida Towing did not present facts showing Olson was amenable to service under the Florida long arm statute. We reach that conclusion, because we are of the opinion that it clearly appears that the cause of action upon which Florida Towing sued did not arise out of the activities of Olson in Florida, and that is a prerequisite, as we shall show, under the decisions of the Supreme Court of Florida, to the applicability of the Florida long arm statute, even though Olson was doing business in Florida.

In Illinois Central Railroad Company v. Simari, Fla., 1966, 191 So.2d 427, 428, the lower court had decided that since the Railroad Company was doing business in Florida within the meaning of Florida's long arm statute, it was amenable to service thereunder. In its opinion, the Supreme Court of Florida said:

"The conclusion reached by the district court was precluded by a prece-dent not cited or referred to in the district court's opinion (the Zirin Case) but relied on by the petitioner here. In Zirin v. Charles Pfizer & Co., Fla. 1961, 128 So.2d 594, we acknowledged that the corporation against which substituted service was sought therein had been 'doing business' within the state within the meaning of Sec. 47.171, but held, nevertheless, that the statute was intended to apply 'only to obligations or causes of action which arose out of the activities of the corporation in the State.' Therefore, the district court should never have reached the question whether this petitioner was doing business in the state, since it is apparent that this cause of action did not arise out of anything that the petition allegedly did in Florida. * * * "

The court held that the Florida long arm statute did not apply to the Railroad Company.

Here, the causes of action set out by Florida Towing in its complaint, and on which it based its claim for the return of the $15,000 down payment, arose out of the alleged failure of Olson to perform the contract to sell, which was made and was to be performed in California, and not in Florida, and the misrepresentation as to the cost of making needed repairs to the Barge, which Florida Towing alleged was made in California.

We therefore hold that the record clearly shows that the causes of action asserted by Florida Towing did not arise out of any activities of Olson in Florida, and regardless of whether it had done any business in Florida, Olson was not amenable to service under the Florida long arm statute.

Affirmed.

10. The burden of proving agency is on the party who asserts it. Bogue Electric Mfg. Co. v. Coconut Grove Bank, (Fla.) 5 Cir., 269 F.2d 1, 4; Miller v. Chase & Co., 88 Fla. 500, 102 So. 553, 554.