**PRODUCT PROMOTIONS, INC.,**
Plaintiff-Appellant,

v.

Jacques Y. **COUSTEAU** et al.,
Defendants-Appellees.

No. 73–2088.

United States Court of Appeals,
Fifth Circuit.

June 5, 1974.

but inaccurate as to another. We therefore affirm in part and reverse and remand in part.

I.

Although important details remain both hazy and in dispute, the pleadings and the testimony taken during a hearing on the motion to dismiss yield a reasonably clear picture of the key operative facts in this controversy.

Plaintiff-appellant Product Promotions, Inc., incorporated under the laws of Texas and located in Dallas, engages, as its name implies, in the business of product sales and television promotion. The individual defendant, Jacques Y. Cousteau, is a citizen of France, a resident of Monaco, and a world famous marine explorer and scientist. Also named as defendants are the "COUSTEAU GROUP COMPANIES, consisting of Centre d'Etude Marines Advancees (CEMA), Les Campagnes Oceanographiques Francaises (COF), Living Sea Corporation (LSC), Les Requins Associes (LRA) and Thalassa Corporation (THA)."[2] Apparently business spin-offs from Cousteau's oceanic exploits, these are identified as foreign corporations and residents of various jurisdictions other than the State of Texas, including the country of France and the States of California and New York. Neither Cousteau individually nor any of the corporate defendants maintains a regular place of business or designated agent for service of process in the State of Texas.

Harold B. Berman, Jay S. Fichtner, Douglas E. Yeager, Dallas, Tex., for plaintiff-appellant.

Hubert D. Johnson, Dallas, Tex., for defendants-appellees.

Before THORNBERRY, GOLDBERG and INGRAHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

In this diversity case we are asked to gauge the reach of the Texas "long-arm" statute[1] as limited by federal constitutional requirements of due process in order to determine whether the district court properly granted nonresident defendants-appellees' motion to dismiss for lack of jurisdiction over the person. According to our calculations the district court's jurisdictional measurements were accurate as to some of the defendants

---

1. Vernon's Tex.Rev.Civ.Stat.Ann. art. 2031b (1964).

2. The identity of the corporate defendants is a source of some confusion. The important events in this narrative occurred between December 1971 and December 1972. At that time the five named companies were evidently individual corporate entities. Although they were collectively known as the "Cousteau Group Companies," the exact nature of the alliance and whether the Cousteau Group also had a separate corporate existence are both unclear from the record. Sometime in the winter of 1972–73, about the time this lawsuit was filed, a Delaware corporation denominated "Cousteau Group,

Inc." was chartered, a step characterized as "formal incorporation" of the old group. App. at 40. The record is silent regarding the continued existence of the five individual companies or their relationship to the Delaware corporation, although there is testimony that CEMA, one of the five, is not part of "Cousteau Group, Inc." App. at 41–42, 46. We have been unable to determine what effect, if any, the formation of the Delaware corporation has on the status of this controversy, and neither side has indicated any desire to substitute parties defendant. In the absence of such a desire or more definite evidence relating to corporate identities, we have determined to proceed with the parties as identified in the pleadings.

In 1971 appellant began to market the "TR–VII Fish Call," a device designed to attract fish through sonic emissions, light, and pellets. Hoping to have Jacques Cousteau test the device and then to use the test results and the Cousteau name in advertising, appellant's president, Elwood Ross, telephoned from Texas to a Mr. Thomas Horton in California. According to Mr. Ross, Horton represented himself as Jacques Cousteau's business manager and vice-president of Thalassa Corporation, one of the Cousteau Group Companies. Horton put Mr. Ross in contact with representatives of CEMA, another of the Cousteau Group, which would be able to make the tests and studies Ross desired.

In January 1972 Ross traveled to Marseilles, France, to meet with Claude Caillart, captain of Cousteau's ship the *Calypso* and an employee of CEMA. Ross advised Captain Caillart of his company's interest in having studies made of the fish call and receiving a report as well as photographs and film for television and other advertising promotions. On January 27, 1972, after he had returned to Dallas, Ross received a letter and attachments from Captain Caillart offering to conduct the tests, detailing the studies to be made, and outlining certain conditions and limitations on use of the results. By letter dated February 7, 1972, Ross accepted the terms contained in Caillart's letter subject to a $700.00 correction to make the price consistent with the terms discussed orally in France, and enclosed a check for $5,000.00 as the first payment on the total price of $21,500.00. In a subsequent letter Captain Caillart through his wife acknowledged both the correction and the first payment.

Pursuant to the terms of the contract, CEMA conducted the test studies off the coast of France and Monaco and mailed to Dallas a series of reports and film. When the film proved to be unsatisfactory, CEMA shot additional footage and mailed it to Dallas. Pleased with the results, appellant began a nationwide distribution of the TR–VII Fish Call through Sears, Roebuck and Company.[3] Under its agreement with Sears, appellant used portions of the CEMA reports and the film in advertising the TR–VII, principally in the form of information on the packaging, a pamphlet enclosed with the fish call entitled "Secrets for Successful Fishing," and television spots.

In December 1972, shortly after the television spots began to run nationally, attorneys acting on behalf of Jacques Cousteau and Cousteau Group, Inc., approached station WOR–TV in New York City, challenging appellant's use of the Cousteau name and threatening to file suit if the station televised the commercials. Acceding to the challenge, WOR–TV refused to present the commercials for which appellant had already paid and which had already been scheduled. The Cousteau attorneys also approached Sears with a similar challenge and threat. Sears then refused further distribution of the TR–VII until changes in the advertising were made. In order to save a business relationship that predated the TR–VII contract, appellant agreed to repurchase several thousand fish calls and prepare new packaging and advertising materials deleting any reference to the Cousteau name.

In late December 1972 appellant filed this suit in the United States District Court for the Northern District of Texas. In the amended complaint appellant sought $340,000 actual damages for breach of the contract between itself and the defendants. In the alternative, appellant also pleaded several tort counts of misrepresentation, conspiracy to commit fraud, and interference with contractual relationships. Appellant also asked for $750,000 in exemplary damages. Substituted service of process

---

3. Sears, Roebuck and Company made an initial purchase from appellant of 260,000 fish calls at $6.47 per unit. Mr. Ross estimated that his company would have netted $1.00 profit per unit on the initial order. Moreover, in anticipation of the holiday season appellant acquired an additional inventory of 40,000 units.

was made on all defendants under the terms of Vernon's Tex.Rev.Civ.Stat.Ann. art. 2031b(3).[4] by serving the Secretary of State of Texas. Thereafter the district court held a hearing on and granted defendants-appellees' motion to dismiss for want of jurisdiction over the person.[5]

## II.

■ The power of a federal court entertaining a suit based on diversity of citizenship to exercise jurisdiction over the persons of non-resident defendants turns on two independent considerations. The law of the state in which the federal court sits must confer jurisdiction over the persons of the defendants, and if it does, the exercise of jurisdiction under state law must comport with basic due process requirements of the United States Constitution. Jetco Electronic Industries, Inc. v. Gardiner, 5 Cir. 1973, 473 F.2d 1228, 1232; Atwood Hatcheries v. Heisdorf & Nelson Farms, 5 Cir. 1966, 357 F.2d 847, 852. *See* 2 Moore's Federal Practice ¶ 4.41–1 [3] (2d ed. 1974).

At the threshold of this two-step analysis in the case at bar, however, we confront a mechanical question over which the parties strongly disagree. Plaintiff-appellant contends that defendants-appellees bore the burden of producing evidence and persuading the district court on their motion to dismiss for want of personal jurisdiction. Citing Texas court decisions that place the burden of proof on the defendant who attacks the personal jurisdiction of the court, appellant reasons that a federal diversity court in Texas must do likewise under the decisions following Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that characterized placement of the burden of proof as a substantive rule governed by state law rather than a procedural rule.

■■ We are unpersuaded by appellant's *Erie* logic. The Texas cases cited by appellant concern the operation of Rule 120a, Texas Rules of Civil Procedure, under which a nonresident defendant may make a special appearance in state court to challenge the court's jurisdiction over his person on the grounds that he is not amenable to process in Texas.[6] As appellant correctly notes, the burden of proof in a Rule 120a special appearance proceeding rests on the movant, the defendant. Taylor v. American Emery Wheel Works, 480 S.W.2d 26, 31 (Tex.Civ.App.—Corpus Christi 1972, no writ); Roquemore v. Roquemore, 431 S.W.2d 595, 600 (Tex.Civ.App. —Corpus Christi 1968, no writ); Thode, *supra* note 6, at 319. Appellant also correctly notes that in diversity cases questions concerning the burden of proof are ordinarily controlled by state law. *E. g.,*

4. Sec. 3. Any foreign corporation, association, joint stock company, partnership, or non-resident natural person that engages in business in this State, irrespective of any Statute or law respecting designation or maintenance of resident agents, and does not maintain a place of regular business in this State or a designated agent upon whom service may be made upon causes of action arising out of such business done in this State, the act or acts of engaging in such business within this State shall be deemed equivalent to an appointment by such foreign corporation, joint stock company, association, partnership, or non-resident natural person of the Secretary of State of Texas as agent upon whom service of process may be made in any action, suit or proceedings arising out of such business done in this State, wherein such corporation, joint stock com-

pany, association, partnership, or non-resident natural person is a party or is to be made a party.

5. In their responsive motion filed in the district court, defendants also complained of mechanical defects in the service. At the hearing in the district court, however, defendants evidently dropped that portion of their complaint, preferring to concentrate on the question of *in personam* jurisdiction. Since defendants have made no attempt to resuscitate the question on this appeal and have acknowledged the existence of actual notice, we pretermit consideration of the mechanical sufficiency of the service.

6. *See generally* Thode, In Personam Jurisdiction; Article 2031b, the Texas "Long Arm" Jurisdiction; and the Appearance to Challenge Jurisdiction in Texas and Elsewhere, 42 Texas L.Rev. 279, 310–32 (1964).

Jones & Laughlin Steel Corp. v. Matherne, 5 Cir. 1965, 348 F.2d 394. The flaw in appellant's argument is that Rule 120a, promulgated in 1962 by the Texas Supreme Court to create an exception to the infamous Texas rule that an appearance by a nonresident defendant to challenge the jurisdiction of the court over his person itself confers jurisdiction, is exactly the sort of state procedural accessory that federal courts are not bound to don whenever they enter the diversity courtroom.

Speaking for the Supreme Court in Hanna v. Plumer, 1965, 380 U.S. 460, 472–473, 85 S.Ct. 1136, 1144–1145, 14 L. Ed.2d 8, 17–18, Chief Justice Warren wrote:

> [T]he constitutional provision for a federal court system . . . carries with it congressional power to make rules governing the practice and pleading in those courts . . . .
>
> "One of the shaping purposes of the Federal Rules is to bring about uniformity in the federal courts by getting away from local rules. This is especially true of matters which relate to the administration of legal proceedings, an area in which federal courts have traditionally exerted strong inherent power, completely aside from the powers Congress expressly conferred in the Rules. . . ." [citation omitted]
>
> Erie and its offspring cast no doubt on the long-recognized power of Congress to prescribe housekeeping rules for federal courts even though some of those rules will inevitably differ from comparable state rules.

 The Federal Rules of Civil Procedure abolished the technical distinction between general and special appearances. See 5 Wright & Miller, Federal Practice and Procedure § 1344 (1969). In all federal courts, including those exercising diversity jurisdiction, the principal method for attacking the court's jurisdiction over the person of a defendant, and the one used in the case at bar, is a Rule 12(b)(2) motion. It is by now well-settled that the party seeking to invoke the jurisdiction of a federal court has the burden of establishing that jurisdiction exists, and the burden may not be shifted to the party challenging the jurisdiction. *Jetco Electronic Industries, supra,* 473 F.2d at 1232; Benjamin v. Western Boat Building Corp., 5 Cir. 1973, 472 F.2d 723, 731; Owen of Georgia, Inc. v. Blitman, 5 Cir. 1972, 462 F.2d 603; Frito Lay, Inc. v. Procter & Gamble Co., N.D.Tex.1973, 364 F.Supp. 243, 250; Bland v. Kentucky Fried Chicken Corp., S.D.Tex.1971, 338 F.Supp. 871, 875; 5 Wright & Miller, *supra,* §§ 1351 at 565, 1363 at 654–55. We find no merit in appellant's ingenious attempts to avoid this principle by characterizing its appearance in earlier decisions as dicta; nor do we agree that in decisions such as *Jetco Electronic Industries* this Court was really speaking of jurisdiction over the subject matter.[7]

Recognition that appellant had the burden of establishing the district court's jurisdiction over the appellees' persons does not quite end the debate in the case at bar, for the parties also disagree over the weight of the burden to be shouldered. Citing *Jetco Electronic Industries, supra,* appellees argue that appellant had to establish a prima facie cause of action. Appellant retorts that assuming *arguendo* it had the burden of

---

7. Appellant argues that defendants having expressly shouldered the burden of proof at the hearing on the motion to dismiss, they are now estopped to complain or deny that the burden was on them. Our reading of the transcript of the hearing convinces us that although defendants did perhaps agree to accept the duty of going forward with the evidence, they explicitly and definitely did not assume the risk of nonpersuasion, nor could they have done so. In any event, able counsel for appellant went to some trouble to present his own evidence during the hearing, and we see no need to hinge the outcome of this jurisdictional controversy on a debate over who agreed to do what. The law is, and was at the time of the hearing, that the party seeking to invoke the federal court's jurisdiction, here the plaintiff, must establish the existence of jurisdiction.

proof, the task required only a prima facie showing of the facts on which jurisdiction was predicated, not a prima facie demonstration of the existence of a cause of action. We find appellant's formulation of the burden it had to carry to be more accurate.[8]

Appellees rely on a shard of language from *Jetco Electronic Industries* with which we have no quarrel,[9] but they improperly imagine the whole from this fragment. The Texas Long-Arm Statute provides that a nonresident defendant who "engages in business" in the State is amenable to process "in any action, suit or proceedings arising out of such business done in" the State. *See* footnote 4 *supra*. Section four of the Statute defines "doing business":

> For the purpose of this Act, and, without including other acts that may constitute doing business, any foreign corporation, joint stock company, association, partnership, or non-resident natural person shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State, or the committing of any tort in whole or in part in this State.

Because the plaintiffs in *Jetco Electronic Industries* relied on the commission of a tort to establish the court's personal jurisdiction over the defendant, they were obliged to make a prima facie showing that a tort had occurred in whole or in part in Texas. Thus the duty to make a prima facie showing of the facts on which jurisdiction was predicated required some reference to the facts alleged as a basis for relief.

What appellees overlook is that although appellant initially pleaded several tort causes of action, counsel for appellant concentrated both at the hearing before the district judge and in this appeal on the breach of contract claim.[10] In order to make a prima facie showing of the facts on which jurisdiction was predicated under the contract portion of the statute, appellant did not have to show prima facie evidence of a breach of contract. Rather, appellant had to present prima facie evidence that (1) a contract to be performed in whole or in part within Texas existed between itself and appellees and (2) the present suit arose out of that contractual arrangement. With this explanation of appellant's burden in mind, we proceed to our review of appellant's performance of the jurisdictional task.

### III.

### A. STATUTORY CONSIDERATIONS —JACQUES COUSTEAU AND THE COUSTEAU GROUP COMPANIES

This Court has recognized that Article 2031b represents an effort by Texas to reach as far as federal constitutional requirements of due process will permit in exercising jurisdiction over the persons of nonresident defendants. *Jetco Electronic Industries, supra*, 473 F.2d at 1234; Gurley v. Lindsley, 5 Cir. 1972, 459 F.2d 268, 278, mandate amended, 466 F.2d 498; *Atwood Hatcheries, supra*, 357 F.2d at 852–853; *accord* AMCO Transworld, Inc. v. M/V Bambi, S.D.Tex.1966, 257 F.Supp. 215, 216–217. *See generally* Thode, *supra* note 6. This means that many, if not most, challenges to *in personam* jurisdic-

---

8. *Accord* Bland v. Kentucky Fried Chicken Corp., S.D.Tex.1971, 338 F.Supp. 871, 875; *see* 5 Wright & Miller, *supra*, § 1351 n. 33 (Supp.1973). *See generally* 4 Wright & Miller, *supra*, § 1068 at 250: ". . . when a plaintiff is seeking to bring a defendant into court under a long-arm statute, he must state sufficient facts in the complaint to support a reasonable inference that defendant can be subjected to jurisdiction within the state."

9. "[P]laintiff meets his burden by establishing merely a *prima facie* cause of action." 473 F.2d at 1232.

10. Indeed, counsel for appellant concedes that he did not present prima facie evidence of any tort cause of action. Reply Brief for Appellant at 6.

tion by nonresident defendants, whether in federal or State court will turn on constitutional considerations. *See, e. g., Atwood Hatcheries, supra*; Lone Star Motor Import, Inc. v. Citroen Cars Corp., S.D.Tex.1960, 185 F.Supp. 48, rev'd on other grounds, 5 Cir. 1961, 288 F.2d 69; Hoppenfeld v. Crook, 498 S. W.2d 52, 56 (Tex.Civ.App.—Austin 1973, writ ref'd n. r. e.) (Phillips, C. J.); Sun-X International Co. v. Witt, 413 S.W.2d 761 (Tex.Civ.App.—Texarkana 1967, writ ref'd n. r. e.). Nevertheless, a plaintiff must always look first to the statutory requirements lest a court conclude that the nonresident defendant stands beyond the grasp of Article 2031b. *E. g.,* Frito Lay, Inc. v. Procter & Gamble Co., N.D.Tex.1973, 364 F. Supp. 243, 250; *cf.* Fulghum Industries Inc. v. Walterboro Forest Products, Inc., 5 Cir. 1973, 477 F.2d 910 (Georgia statute).

 The case *sub judice* illustrates the difference between deciding that the Texas Long Arm Statute will by its own terms reach far enough to cover a nonresident defendant and determining whether the statutory stretch must be hamstrung by federal constitutional limitations. We think it is beyond serious dispute that defendant CEMA was within the literal grasp of Article 2031b. The correspondence between Ross of Product Promotions and Caillart of CEMA, the course of conduct by both parties thereafter, and Ross's testimony at the 12(b)(2) hearing clearly establish the existence of a contract between Product Promotions and CEMA, performed at least in part in Texas through delivery of the films and reports to appellant in Dallas.[11] And this proceeding has obviously arisen out of that contractual arrangement. Thus the district court had jurisdiction over the person of CEMA if the operation of the statute would not offend constitutional requirements.

 Jacques Cousteau and the other corporate defendants, however, stand on different ground. Since the contract was between CEMA and Product Promotions, counsel for appellant relies on an agency theory to establish the other defendants' amenability to process under the statute. According to this theory, in the negotiations and contractual relationship with appellant, CEMA was acting for, on behalf of, and as the agent of Cousteau individually and as agent or subsidiary of the Cousteau Group Companies. Thus these others are also parties to the contract and engaged in business within the State. We detect no particular flaw in this argument abstractly stated. Courts and commentators have recognized that an agency relationship may justify finding that a parent corporation "does business" in a jurisdiction through its subsidiary's local activities. *E. g.,* Bland v. Kentucky Fried Chicken Corp., S.D.Tex.1971, 338 F.Supp. 871, 875; 4 Wright & Miller, *supra,* § 1069 at 259; *see* 2 Moore, *supra,* ¶ 4.25 [6] (service of process); 4 Wright & Miller, *supra,* § 1004 (service of process). Moreover, an agent may in some circumstances itself be a party to an agreement between its disclosed principal and a third party. *See* 2 Restatement (Second) of Agency §§ 320, 323 (1958).

 Under this theory the alleged agency and parent-subsidiary relationships were facts on which jurisdiction was predicated, and appellant had the burden of making a prima facie showing of their existence. It is here that appellant founders from the confusion surrounding the identity of and relationship between the parties defendant. We can find no evidence in the

11. We agree with appellant that in determining whether the *statutory* requirements for jurisdiction have been met, the place or time of "execution," "consummation," or "delivery" is irrelevant—performance, contemplated or accomplished, is the touchstone. *At-*
*wood Hatcheries, supra,* 357 F.2d at 852 n. 14. And it does not matter which party is to perform in Texas so long as some performance is to occur there. Clark Advertising Agency, Inc. v. Tice, N.D.Tex.1971, 331 F.Supp. 1058, 1060.

record before us that CEMA was, as appellant argues, a subsidiary of the "Cousteau Group Companies," even assuming such a separate corporate entity existed. And even were we to assume the existence of a parent-subsidiary relationship, we can find no evidence that the parent exercised the type of control necessary to ascribe to it the activities of the subsidiary. Nor can we find any support for the assertion that the Cousteau Group Companies, either individually or collectively, were the "alter-egos" of Jacques Cousteau.[12] Certainly the hearsay testimony regarding Horton's statement to Ross that Cousteau does business through the Cousteau Group Companies does not suffice. We concede that the evidence in the record shows that the so-called Cousteau Group Companies were, at least at the time this contract was executed, related in some way to each other and to Jacques Cousteau. Unfortunately, that is not enough; it was for appellant to sort out those business relationships, and the failure to do so is jurisdictionally fatal.

 We are likewise convinced that appellant failed to carry the burden of establishing by prima facie evidence the existence of any agency relationship between CEMA and the other defendants other than that based on parent-subsidiary or alter-ego status. Under well-settled principles of law, appellant had to make a prima facie showing that in this contractual dealing CEMA acted with either actual or apparent authority on behalf of the others.[13] Both types of authority depend for their creation on some manifestations, written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority). *See* 1 Restatement (Second) of Agency §§ 26, 27 (1958). It is certainly true that "the entire transaction between Plaintiff and Defendant C.E.M.A. was permeated with references to Defendants Jacques Cousteau and the Cousteau Group Companies." Brief for Appellant at 16. Yet none of these references rises to the level of "manifestations" that Cousteau individually or the other companies were willing for CEMA to act on their behalf in contracting with appellant. More importantly, assuming arguendo that we could find such manifestations, they all came, not from the putative principals, but from the alleged agent CEMA.[14] That appellant's president thought he was in effect dealing with Cousteau himself and an entity called the "Cousteau Group" is simply not enough on these facts to establish a prima facie case that he was in fact doing so.[15]

12. *See* 4 Wright & Miller, *supra*, § 1069 at 19–20 (Supp.1972).

13. Even assuming the existence of an agency relationship, we find nothing in the record to indicate that the principal or principals should be liable on the theory that CEMA had a power arising from the agency relationship and not dependent on actual or apparent authority. *See* 1 Restatement (Second) of Agency § 140(c) (1958).

14. Obviously the undisputed fact that CEMA was a "Cousteau Group Company," even if communicated by the others, is by itself no evidence on the issue of CEMA's authority to act on their behalf. Appellant points to the statements by Mr. Horton, who represented himself as an officer in one of the companies and arranged Ross's meeting with CEMA, that Cousteau does business through the Cousteau Group. This hardly constitutes a manifestation by either Cousteau or Horton's own company that CEMA was au-

thorized to act on behalf of anyone besides CEMA. Appellant also points to the term of the contract calling for submission of any portion of the CEMA reports "to Cousteau Group approval before advertisement use." App. at 16. This does evidence a relationship of some sort between CEMA and the others, and taken with other evidence it might support an inference of agency. Unfortunately, the brochures describing the Cousteau Group Companies, the references to use of the name "Cousteau's Group Company," and the pictures of Cousteau himself do not together total the necessary other evidence. Moreover, to interpret this term in the contract negotiated by the alleged agent as a manifestation of authority by the alleged principals is bootstrapping of the worst sort.

15. Appellant has not argued that the other appellees should be liable under a theory of estoppel or change of position, *see* 1 Re-

We hold that appellant failed to present prima facie evidence that CEMA was clothed with the agent's authority to contract with Product Promotions on behalf of either Cousteau individually or the other Cousteau Group Companies, individually or collectively. Appellant having failed to carry its burden of bringing these other appellees within the reach of the Texas Long-Arm Statute, the able trial judge correctly dismissed the suit against them for want of personal jurisdiction.

### B. CONSTITUTIONAL CONSIDERATIONS—CEMA

We turn to the question whether the district court's exercise of jurisdiction over the person of CEMA, authorized by the Statute, would comport with constitutional requirements. We answer affirmatively, and hold, therefore, that the district court erred in dismissing the suit against defendant CEMA.

In reaching this conclusion we work within the familiar framework provided by a series of Supreme Court decisions that rendered much of the learning on in personam jurisdiction obsolete.[16] Under this long-arm quintet the governing principle is the fairness of subjecting a defendant to suit in a distant forum. Only if the nonresident defendant has such "minimum contacts" with the state "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,' " International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), or if the defendant has performed some act "by which [it] purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), may the forum, consistently with due process, extend its long arm to embrace it.

*Jetco Electronic Industries, supra,* 473 F.2d at 1234. Thus the decisions "set up a dual test for determining whether a court may take jurisdiction without depriving a defendant of due process of law." First, "there must be some minimum contact with the state which results from an affirmative act of the defendant." Secondly, "it must be fair and reasonable to require the defendant to come into the state and defend the action." 2 Moore, *supra* note 16, ¶ 4.25 [5] at 1171–72.[17]

statement (Second) of Agency § 8B, or ratification of the contractual relationship, *see id.* §§ 82, 100. We therefore pretermit consideration of those possibilities.

16. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950); Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); McGee v. Int'l Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L. Ed.2d 1283 (1958). *See generally* 2 Moore's Federal Practice ¶ 4.25 [2]–[4] (2d ed. 1974); 4 Wright & Miller, *supra,* §§ 1064–67.

17. Various courts have sought to extract from the Supreme Court decisions a more specific set of factors for determining the constitutional validity of the exercise of *in personam* jurisdiction over a foreign corporation. In an often quoted opinion, for example, then Circuit Judge Blackmun identified three primary factors—the quantity of contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts—and two other factors—interest of the forum state in providing a forum for its residents, and convenience to the parties. Aftanase v. Economy Baler Co., 8 Cir. 1965, 343 F.2d 187, 197. Other courts have focused on the nature and character of the business, the number and type of activities within the forum, and whether such activities gave rise to the cause of action, as well as on the interest of the forum and convenience of the parties. Lone Star Motor Import, Inc. v. Citroen Cars Corp., S.D.Tex.1960, 185 F.Supp. 48, 56 rev'd on other grounds, 5 Cir. 1961, 288 F.2d 69; *accord* Odom v. Thomas, S.D.Tex.1971, 338 F.

In applying the first of these two tests in the case at bar, we emphasize that the number of the defendant's contacts with the forum state is not, of itself controlling. "[V]ery little purposeful activity within a state is necessary to satisfy the minimum contacts requirement," although "we have . . . unequivocally required *some* activity by the defendant . . . ." Benjamin v. Western Boat Building Corp., 5 Cir. 1973, 472 F.2d 723, 726 (emphasis in the original). As important as the existence of some contacts with the forum is that those contacts support an inference that the nonresident defendant purposefully availed himself of the benefits of conducting business in the forum. *Id.*; Gurley v. Lindsley, 5 Cir. 1972, 459 F.2d 268, 278, mandate amended, 466 F.2d 498.

Appellee CEMA insists that its contacts with the State of Texas were insufficient to meet the constitutional requirement. It had no place of business there; it had no local advertising, listings, or bank accounts; it solicited no business there, and did none aside from that with appellant; it sent no representatives there; and in fact it performed no physical act of any sort there.[18] The contract was initiated by appellant when Ross visited France, and all of the negotiations occurred in France. Moreover, all of the studies

and reports, which were prepared in French and translated into English, as well as the photographs and film were made along the Mediterranean coast, thousands of miles away. And all payments by appellant were to be made in Marseilles. In fact, CEMA concludes, its only contacts with Texas resulted from the performance of its contractual obligation to send the reports and film to Dallas, which admittedly required several deliveries.

We think appellee has understated both the number and the importance of its contacts with Texas. In the first place, we believe CEMA has incorrectly placed the essential locus of its contract with Product Promotions. Although the contract is silent regarding the law to be applied to it, it is generally recognized that "the place of the contract is the place where the last act necessary to the completion of the contract was done, that is where the contract first creates a legal obligation." 1 Williston on Contracts § 97 at 356 (3d ed. Jaeger 1957); *accord,* Florida Towing Corp. v. Oliver J. Olson & Co., 5 Cir. 1970, 426 F.2d 896, 900. Under that principle, Ross's letter of February 7, 1972, accepting CEMA's offer,[19] an acceptance which was effective on dispatch in Dallas, made Texas the place of the contract.[20] Moreover, that most of

---

Supp. 877, 878; Hearne v. Dow-Badische Chemical Co., S.D.Tex.1963, 224 F.Supp. 90, 99. *See* O'Brien v. Lanpar Co., 399 S.W.2d 340 (Tex.1966) (Pope, J.).

18. *See* 4 Wright & Miller, *supra,* § 1069 at 258.

19. Citing Florida Towing Corp. v. Oliver J. Olson & Co., 5 Cir. 1970, 426 F.2d 896, CEMA argues that Ross' February 7 letter was really a counter-offer because it varied from the price terms in the offer and was conditioned on this variation. Thus France, not Texas, was the place of contract. We disagree. Ross' letter was clearly not drawn with the precision of a legal scrivener, but fairly read it did not *alter* any of the terms contained in the offer letter. Ross did refer to a variation in price, but this was simply a correction of what both parties agree was a mistake in the mathematical computation

contained in the offer letter. It was otherwise an unequivocal, unconditional acceptance, accompanied by the first payment required under the terms of the contract. *See generally* 1 Williston on Contracts §§ 72, 73, 77, 78, 79 (3d ed. Jaeger 1957).

20. We note, without so holding, the strong possibility that Texas law might apply to this contract. Under Texas conflict of laws rules, where the parties have manifested no contrary intent regarding the law to be applied, the presumption is that the parties contract with reference to where the contract was made. Austin Building Co. v. National Union Fire Ins. Co., Tex.1968, 432 S. W.2d 697, 701. *See* Dailey v. Transitron Electronic Corp., 5 Cir. 1973, 475 F.2d 12, 14; Lipschutz v. Gordon Jewelry Corp., S. D.Tex.1974, 373 F.Supp. 375, 384. The correspondence between the parties, which

CEMA's substantive work was done in the Mediterranean area does not alter the fact that an integral, essential portion of CEMA's performance, delivery of the results in satisfactory form, had to take place in Dallas.[21] In any event, the Supreme Court in McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), made it clear that neither the defendant nor the defendant's agents need have been physically within the State—contact by mail alone can be sufficient. And even if the defendant performs no physical act within the State, activities outside the State can provide adequate contacts if they have reasonably foreseeable consequences within the State.[22]

■■■■ Aside from their number, appellee's contacts are also adequate to support the inference of an affirmative, purposeful decision by CEMA to avail itself of the privilege of conducting some business in Texas. As a careful study of the Supreme Court decisions suggests, this requirement should not be read too literally; thus, for example, the nonresident defendant need not have agreed that suits on the contract will be heard in the forum state. Instead, the requirement reflects the Court's Conclusion that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283, 1298. The operative consideration is that the defendant's contacts with the forum were deliberate, rather than fortuitous, so that the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable, if not foreseen, rather than a surprise.[23]

appellee stoutly insists represents the total, integrated contract, makes no mention of the law to be applied.

21. CEMA emphasizes that appellant's performance, payment, took place in Marseilles. Without attempting to untangle the various legal obligations and consequences of this very sketchy contract, we do note that there is Texas authority to the effect that when performance is the payment of money and no site for payment is specified in the contract, the place of performance is the payor's domicile, in this case Texas. Texas Gas Prods. Corp. v. Rowan, 317 S.W.2d 815 (Tex.Civ.App.—Fort Worth 1958, writ dism'd).

22. See 4 Wright & Miller, supra, § 1069 at 259–60 & n.86, 264–65. In McGee, supra, a Texas insurance company had mailed a certificate and offer of reinsurance to a California resident in California. The California resident accepted the offer in California, and thereafter mailed all the premium payments from California to Texas. The Texas company had neither solicited nor done business in California other than the one policy, and had no other contacts with California. Nevertheless, the Court held that a California court's exercise of personal jurisdiction over the nonresident corporation was consistent with due process.

23. In Hanson v. Denckla, supra, the Court concluded that this requirement was not met where a Delaware corporate trustee of a trust executed in Delaware by a Pennsylvania domiciliary, the res of which was located in Delaware, was sued in a declaratory action in Florida by certain legatees. After executing the trust agreement, the settlor had moved to Florida, where she had received trust income and executed a power of appointment. This, the Court held, did not give Florida "a substantial connection with the contract" on which the suit was based. The suit centered on the validity of the trust agreement executed in Delaware by non-Floridians, and the defendant had done no act or consummated no transaction in Florida relating to the agreement's validity. Moreover, the defendant had no office in Florida, had never solicited or transacted business there, and none of the trust assets had been held or administered there. Thus the contacts with Florida, when viewed from the defendant's perspective, were completely fortuitous.

The rationale underlying this requirement also emerges from lower court decisions in which the requirement was found to present a constitutional hurdle to a court's exercise of personal jurisdiction over a nonresident defendant. For example, in Kaye-Martin v. Brooks, 7 Cir. 1959, 267 F.2d 394, a buyer and a broker, both from New York, sued an Arkansas resident for breach of a contract to sell stock in a Texas company. Though the contract had its origin in New York and was executed in final form in Texas, suit was filed in Illinois because the broker had met the defendant for discussions in Chicago while the defendant was there attending an

It is clear to us that this case rests on more than the unilateral activity of a Texas plaintiff claiming some relationship with a nonresident defendant. The cause of action for breach of contract arose out of a transaction between the parties that was consummated in Texas. Moreover, though CEMA may not have planned ever to come to Texas, we cannot say that CEMA's contacts with the State were purely fortuitous or accidental. CEMA entered a contract that required some performance in Texas; that it did not contemplate breaching its own contractual obligations does not make it unreasonable to foresee that those obligations might be tested in Texas. And since the contract was made in Texas, CEMA had reason to foresee that enforcement and protection of its own rights under the contract might depend on the laws of Texas.[24] In short, CEMA voluntarily entered a transaction with one it knew to be a Texas resident,[25] a transaction which had a substantial connection with Texas and which CEMA had reason to know could have consequences in Texas.[26]

A second test must also be satisfied if a court's exercise of personal jurisdiction over a nonresident defendant is to be consistent with due process. Simply stated, it must not be unfair or

---

unrelated convention. Finding no indication that the parties intended to invoke the benefits or protections of Illinois law, the court concluded that the contact with Illinois was wholly fortuitous and insufficient to give Illinois personal jurisdiction over the defendant. *Accord*, Rosenthal & Co. v. Dodick, N.D.Ill.1973, 365 F.Supp. 847; *see* Curtis Publishing Co. v. Birdsong, 5 Cir. 1966, 360 F.2d 344.

24. Appellant argues that CEMA purposefully availed itself of the privilege of conducting business in Texas through the contractual provision for continuous supervisory rights over use of the reports and film. Atwood Hatcheries v. Heisdorf & Nelson Farms, 5 Cir. 1966, 357 F.2d 847, 853–54; *see* Fisons Ltd. v. United States, 7 Cir. 1972, 458 F.2d 1241, 1251–1252, cert. denied, 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 581. We are inclined to agree with CEMA that the contractual provision for "approval for advertisement use" falls far short of the kind of detailed, systematic, far-reaching control and supervision imposed by the vendor on the vendees in *Atwood Hatcheries*. It does suggest, however, that CEMA foresaw the possibility of contacts with appellant in Texas beyond the delivery of the films and reports.

25. *See* Electro-Craft Corp. v. Maxwell Electronics Corp., 8 Cir. 1969, 417 F.2d 365, 368–369.

26. At oral argument CEMA relied heavily on Benjamin v. Western Boat Building Corp., 5 Cir. 1973, 472 F.2d 723, in which a resident of Louisiana had brought suit in Louisiana against a Washington corporation for alleged breach of contract in the construction of a fifty-three foot yawl. This Court concluded that the defendant's contacts with Louisiana were insufficient to support a finding that the defendant had purposefully enjoyed the benefits and protections of Louisiana law.

We think CEMA's reliance on *Western Boat* founders on the factual differences between that case and the one at bar. Most importantly, the contract at issue there was formed, not in the forum State, but in the State of Washington, and called for construction, inspection, and delivery of the vessel there. As provided, the plaintiff took physical possession in Tacoma. The contract did refer to plaintiff as a resident of New Orleans, and defendant apparently knew that New Orleans was to be the vessel's home port. On the other hand, the plaintiff spent much of his time at sea or at his Greensboro, North Carolina home, and during much of the early correspondence between the parties he had used the North Carolina address.

We are cognizant of the reluctance of many courts to allow personal jurisdiction over a nonresident when the defendant's sole contact with the forum is a single contract by mail. *See, e. g.*, Marival, Inc. v. Planes, Inc., N.D.Ga.1969, 302 F.Supp. 201, 207–210; Golden Belt Mfg. Co. v. Janler Plastic Mold Corp., M.D.N.C.1967, 281 F.Supp. 368; Lone Star Motor Import, Inc. v. Citroen Cars Corp., S.D.Tex.1960, 185 F.Supp. 48, rev'd on other grounds, 5 Cir. 1961, 288 F.2d 69. On the other hand, the Supreme Court in *McGee* demonstrated that a single contract by mail can be constitutionally sufficient, reducing the minimum contacts requirement, in the words of one scholar, "to a gossamer touch." The relevant concern should be, not whether the defendant's contact with the forum is limited to a single contract by mail, but rather whether the defendant's contact with hte forum rests on something more substantial than the mere fortuity that the plaintiff happens to be a resident of the forum.

unreasonable to require the nonresident to defend the suit in the forum. Although no particular factor controls our answer, this test requires us to consider such things as the interest of the state in providing a forum for the suit, the relative conveniences and inconveniences to the parties, and basic equities. We conclude that the case *sub judice* meets the requirement of this second test.

We base this conclusion on several considerations. In the first place, Texas certainly has a legitimate and reasonable interest in providing a forum for this suit.[27] The plaintiff is a Texas resident, the contract was made in Texas, and Texas law will surely be of some relevance in resolving the suit. In other words, we see a rational nexus between this lawsuit and a Texas forum.[28] Measuring the convenience to one party against the inconvenience to the other results in something of a stand-off, *Atwood Hatcheries, supra,* 357 F.2d at 854 n. 23. Obviously it is more convenient for appellant to litigate in Texas and more convenient for CEMA to do so elsewhere.[29] Nevertheless, the important thing is that we are unable to conclude that any hardship or inconvenience to CEMA from having to defend the suit in Texas rises to the level of a denial of due process. Finally, CEMA has pointed to no particular inequity that might result if a court in Texas exercises jurisdiction over CEMA's person in this suit, and we can find none. The maintenance of this suit against CEMA in Texas will not "offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

27. One of the important factors underlying the decision in McGee v. Int'l Life Ins. Co., *supra,* was the Supreme Court's conclusion that California, the forum State, had a great interest in providing a forum for its residents when nonresident insurers refused to pay claims. The Court noted that the costs of following insurers to other states might well preclude holders of small or moderate claims from enforcing these claims. The Court also noted that California had emphasized this interest with a statute subjecting foreign corporations to suit in California on insurance contracts with residents even if the corporations could not be served with process in California.

Texas may have a general interest in allowing its residents to use Texas courts to enforce their claims against nonresidents. This Court has recognized that the Texas legislature intended the Long-Arm Statute to reach as far as constitutionally permissible. On the other hand, the Texas interest in providing a forum for suit is less than California's in *McGee* where, as here, both parties are corporations, more nearly equal in size, and the claim is large enough that it will not be dropped if the defendant must be pursued elsewhere. Nevertheless, given the strength of the connection between the contract at issue and the law of Texas, we believe the State's interest in the case *sub judice* surpasses any general feeling of benevolence toward resident plaintiffs suing nonresidents.

28. *See* Curtis Publishing Co. v. Birdsong, 5 Cir. 1966, 360 F.2d 344.

29. The factors associated with the doctrine of forum non conveniens are relevant here, but we need not give them overriding importance. 2 Moore, *supra,* ¶ 4.25[5] at 1172. Before the district court counsel for CEMA argued that because another suit arising out of this same transaction is now pending in federal court in New York with Cousteau as plaintiff, that forum is the most convenient for this suit. We agree that it might be to the advantage of both parties to resolve all their differences at one time, under one roof. We also agree that New York is a logical forum for appellant's grievances concerning the alleged tortious interference with its contractual rights with WOR–TV. On the other hand, we see certain advantages to the Texas forum, not the least of which are that the basic contract was executed there and that at least two of the important parties, Product Promotions and Sears, are located there. Since officials and witnesses from CEMA will probably have to come from France in either case, the difference between New York and Texas seems relatively inconsequential in this jet age, at least so far as CEMA is concerned. In any event, these are considerations better left to the parties and the able district judge on remand.

IV.

In the time since the Supreme Court first articulated the "minimum contacts" standard in International Shoe Co. v. Washington, *supra*, two principles have emerged to guide the course of courts faced with a challenge to personal jurisdiction over a nonresident defendant. First, the new flexibility in measuring the constitutional validity of an exercise of in personam jurisdiction does not

> [herald] the eventual demise of all restrictions in the personal jurisdiction of state courts. [citation omitted] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.

Hanson v. Denckla, *supra*, 357 U.S. at 251, 78 S.Ct. at 1238, 2 L.Ed.2d at 1296. Secondly, no one formulation of the constitutional test could possibly encompass all the potentially important factors, nor could a formula perform the crucial task of weighing and balancing the relevant considerations. Here as elsewhere, important constitutional questions prove themselves immune to solution by checklist, and each case must be decided on its own facts. Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

The able trial judge faced a difficult and unenviable task: trolling with tangled lines of authority for legal principles that are not to be found in surface waters. We do not pretend to the perfected techniques of the compleat angler, but happily we have done our fishing in quieter, more secluded lagoons than those permitted the district judge. Using the light from those two principles, we have determined that although CEMA may have preferred to cast its bait in Mediterranean waters, sounds reverberating from the fish call are sufficient to land CEMA within the jurisdiction of Texas.

Affirmed in part, reversed and remanded in part.