BANKERS SECURITY LIFE INSURANCE SOCIETY, Plaintiff,

v.

Judith S. KANE, f/k/a Judith S. Katz, as owner and beneficiary of the life insurance policy of Arthur H. Kane; Estate of Arthur H. Kane, f/k/a Arthur H. Katz; Judith S. Kane, f/k/a Judith S. Katz, as personal representative of the Estate of Arthur H. Kane, f/k/a Arthur H. Katz; and Judith S. Kane, f/k/a Judith S. Katz, an individual, Defendants.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff,

v.

Judith S. KANE/KATZ, as owner and beneficiary of life insurance policy of Arthur H. Kane: Estate of Arthur H. Kane/Katz: Judith S. Kane/Katz as personal representative of the Estate of Arthur H. Kane/Katz: and Judith S. Kane/Katz, an individual, Defendant.

Nos. 87–2263–Civ, 88–0678–Civ.

United States District Court, S.D. Florida.

June 27, 1988.

David C. Pollack, Stroock & Stroock & Levan, Miami, Fla., for defendants.

Cecilia Aulick, Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, Miami, Fla., for plaintiff Prudential Ins. Co. of America.

Alan Fein, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, Fla., for plaintiff Bankers Sec. Life Ins. Society.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS TO DISMISS WITH PREJUDICE

HASTINGS, District Judge.

THIS MATTER is before the Court upon named Defendant's motions to dismiss for failure to state claims upon which relief can be granted. Rule 12(b)(6), Fed.R.Civ.P. After careful consideration of the motions and memoranda in support and opposition, and being fully advised, this Court GRANTS the motions for the reasons stated below.[1]

---

1. On December 4, 1987, the case of *Bankers Security Life Insurance Society v. Judith S. Kane,* et al., case number 87–2263–Civ–Hastings (hereinafter referred to as "the *Bankers* case") was filed with this Court. On April 15, 1988, the case of *Prudential Insurance Company of America v. Judith S. Kane/Katz,* etc., case number 88–0678–Civ–Scott (hereinafter referred to as "the *Prudential* case") was filed and pursuant to Local Rule 4, was randomly assigned to Judge Thomas E. Scott. Upon motion of Plaintiff, Prudential Insurance Company of America,

In judging a Complaint for purposes of Rule 12(b)(6), a Court must assume that all well-pled facts are true and correct. Toward that end, the Complaint must be liberally construed in favor of Plaintiff. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Smith v. Meese*, 821 F.2d 1484, 1496 (11th Cir.1987); and *United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547, 549 n. 1 (5th Cir.1980). With this standard in mind, the Complaints filed in these actions allege the facts set forth below.

## I. CAUSES OF ACTION

### A. BANKERS SECURITY LIFE INSURANCE SOCIETY

Plaintiff, Bankers Security Life Insurance Society, (hereinafter referred to as "Bankers") is an insurance company incorporated under the laws of the State of New York with its principal place of business in Arlington, Virginia. Bankers issued two life insurance policies on the life of decedent Defendant, Arthur H. Kane, formally known as Arthur H. Katz (hereinafter referred to as "Kane").

The policies were issued in 1984. Kane died by his own hand on October 26, 1987. Bankers seeks to declare the life insurance policies void and brings a cause of action against the primary beneficiary of said policies and personal representative of Kane's estate, Judith S. Kane, formerly known as Judith S. Katz (hereinafter referred to as "Mrs. Kane" or "Defendant"). Bankers' first count is brought pursuant to 28 U.S.C.

Section 2201. Bankers also brings actions against Mrs. Kane individually for fraudulent misrepresentation and conspiracy.

### B. PRUDENTIAL INSURANCE COMPANY OF AMERICA

Plaintiff, Prudential Insurance Company of America, (hereinafter referred to as "Prudential") is an insurance company incorporated under the laws of the State of New Jersey.[2] Prudential issued an insurance policy insuring the life of Kane in 1980. Once again, Mrs. Kane is the primary beneficiary of the policy. Prudential also seeks to declare its policy void pursuant to 28 U.S.C. Section 2201. Prudential also brings an action for fraudulent misrepresentation against Mrs. Kane.[3]

### C. JURISDICTION AND VENUE

In both matters, this Court has jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1). Venue is also appropriate pursuant to 28 U.S.C. Section 1391(a).

### D. FACTUAL ALLEGATIONS COMMON TO BOTH ACTIONS

It appears undisputed that prior to 1976, Kane was an attorney with his practice established in Kansas City, Missouri. At that time, Kane was known by the surname of Katz.[4] In 1976, Kane aided the federal government in a prosecution involving the manipulation of the stock price of Magic Marker Corporation, a well-known manufacturer of felt-tip pens. As a result of

---

Judge Scott, after hearing argument of all parties to both cases, directed that his case be transferred and consolidated with the first filed case pursuant to Local Rule 6(C) by Order dated May 18, 1988.

Defendant in the *Bankers* case, has requested oral argument pursuant to Local Rule 10(B)(1) regarding the motion to dismiss. This motion is not opposed. However, a review of the pleadings in both cases and the cited case law manifestly demonstrates that oral argument in these matters would be redundant and therefore unnecessary. Thus, the Defendant's motion for oral argument is DENIED.

**2.** Prudential does not inform the Court of its principal place of business.

**3.** Pursuant to Rule 57 Fed.R.Civ.P., the declaratory judgment actions must be treated expedi-

tiously. This opinion, of course, deals with all causes of action contained in the Complaints.

On a small procedural matter, it should be noted that Bankers addresses Mrs. Kane in the plural, styling its Complaint in terms of Plaintiff v. Defendant"s". Prudential, on the other hand, treats Mrs. Kane in the singular. This Court believes Prudential's method is the correct alternative. No matter how many hats Mrs. Kane wears, be it as beneficiary or personal representative, she still is only one person. Thus, this Court will refer to Mrs. Kane in the singular as Defendant.

**4.** The Complaints do not reveal precisely when Mrs. Kane married the decedent but do suggest that the couple were married prior to 1976.

Kane's assistance, the government was able to convict twenty defendants, including a reputed associate of the late Meyer Lansky. Lansky has been alleged, both during his lifetime and since, to have been a major figure in American organized crime. In or about late 1976 or 1977, the Attorney General of the United States authorized Kane's inclusion into the Federal Witness Relocation Program, pursuant to 18 U.S.C. Section 3521 et seq.[5]

In 1977, Kane, together with three members of his law firm and others were indicted by the United States Government. The indictments alleged that Kane had participated in a scheme to stage apparent accidents, falsify medical records and submit fraudulent claims to automobile insurance companies. In 1978, Kane pled guilty to fraud. Once again, Kane assisted the Federal Government in the prosecution of this case and testified against his co-defendants.[6] As a result of his guilty plea, Kane served six months of a two year sentence under the name of Arthur H. Katz. Kane was also disbarred and he paid a $5,000 fine. The other defendants pled guilty or were convicted.

In accordance with the Witness Relocation and Protection Program (hereinafter "Witness Program" or "Program"), Kane and his wife assumed their new surnames in 1979 and moved to Dade County, Florida. They obtained new drivers' licenses, employment, social security numbers and purchased a house, all with the assistance of the Federal Government. Each of these activities were consummated after the Kanes had assumed their new identities.

After one year of living as Mr. and Mrs. Kane, the couple submitted an application for insurance on Mr. Kane's life to Prudential. Five years after their arrival in Florida, the Kanes obtained two life insurance policies from Bankers. In all three policies, the risk insured was Arthur Kane's life. Similarly, the primary beneficiary of the policies was Judith S. Kane. The information supplied to both Prudential and Bankers by the Kanes regarding their background and history was that presumably supplied to them by the Government of the United States of America pursuant to its legislative grant of authority as promulgated in the Witness Program statute.

Between 1984 and 1987, Kane heavily invested in the stock market. Plaintiffs allege that upon information and belief he accumulated at least seven million dollars in assets. During that same period of time, Kane was employed as a claims representative for the Social Security Administration.

Beginning on October 19, 1987, the world stock markets experienced one of their most dramatic declines in modern history. Beginning on this "Black Monday," the markets continued to decline for several days, making only a minimal recovery by the week's end. On the following Monday, October 26, 1987, Kane entered a Dade

---

5. Both Bankers and Prudential have alleged that the "statute required, as a prerequisite to entrance into the program, a finding by the United States Attorney General that a crime of violence was likely to be committed against [Kane]." (Bankers' and Prudential's Complaints at paragraphs 9). However, prior to its amendment in 1984, the statute which memorialized the parameters of the Witness Protection Program does not reveal any such requirement. Similarly, if there were any federal regulations concerning this matter in the late 1970's, counsel for Plaintiffs have failed to bring them to this Court's attention. Nevertheless, inasmuch as this Complaint is being judged under the standard for motions to dismiss stated above, Plaintiffs' allegation on this point, even though an allegation of law, will be presumed true. See Wright & Miller, Federal Practice and Procedure, Paragraph 1357 (allegation of law, on mo-

tion to dismiss, not entitled to same presumption of truth as allegation of fact).

6. The Complaints are unclear whether Kane's inclusion into the Federal Witness Relocation and Protection Program was the result of his cooperation in the Magic Marker Prosecution or his subsequent cooperation in the insurance fraud indictments.

The draftsmen of both Complaints also do not disclose in which district the fraud indictments were prosecuted. For purposes of this opinion however, it is assumed that these charges were prosecuted in the district in which Kansas City, Missouri is located, i.e. the Western District of Missouri. Therefore, this prosecution will henceforth be referred to as the "Kansas City matter."

County branch of the stock brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter referred to as "Merrill Lynch") where he traded securities on a regular basis. Alleging that because Kane was "despondent over losing his fortune in the stock market", (Bankers' and Prudential's Complaints at paragraphs 17) Kane shot and killed Jose Argilagos, the branch office manager and critically wounded Lloyd Kolokoff, Kane's stockbroker. Kane then turned the gun on himself and committed suicide.[7]

When Bankers and then Prudential received information from Mrs. Kane manifesting her intention to seek payment under the policies, Plaintiffs filed their respective Complaints in the above-captioned matters and this litigation ensued.

## II. DISCUSSION OF LAW

■ The arguments of both Plaintiffs are identical. Prudential and Bankers contend that the insurance contracts which they entered into with Kane were void *ab initio* because: (1) there was no meeting of the minds between the parties regarding fundamental particulars of the life insurance contracts, in particular Kane's former identity; and, (2) the history which was created by the Government regarding the Kanes and supplied to the Plaintiffs in lieu of information concerning Kane's former identity precluded Bankers and Prudential from discovering that Kane had received death threats in the Magic Marker prosecution; that Kane had pled guilty to insurance fraud in the Kansas City matter; and, as a result of these two facts, Kane was "an inappropriate applicant for life insurance coverage." (Bankers' Complaint at

paragraph 14; Prudential Complaint at paragraph 14.)[8]

Mrs. Kane defends against these actions upon the grounds of the incontestability clauses contained in the respective insurance contracts. Again, these clauses are almost identical and, in essence, state that except for the non-payment of premiums, the insurance companies will be prevented from contesting the contracts after they have been in force for a period of two years.[9] Here, it is undisputed that Kane's death occurred after the two-year limitations in all three contracts had expired.

Mrs. Kane contends that the respective incontestability clauses, and the public policy which supports them, precludes both Bankers and Prudential from disclaiming liability under these life insurance contracts. So too, Mrs. Kane maintains that no separate cause of action can be permitted against the intended beneficiary for an alleged "fraud" or "conspiracy" on these facts, for to do so would undermine the very purpose of these clauses.

In support of their position, Bankers and Prudential rely upon a line of cases which create a narrow exception to the enforcement of life insurance incontestability clauses. *Obartuch v. Security Mutual Life Insurance Co.*, 114 F.2d 873 (7th Cir. 1940); *Ludwinska v. John Hancock Mutual Life Insurance Co.*, 317 Pa. 577, 178 A. 28 (1935); *Petaccio v. New York Life Insurance Co.*, 125 Pa.Super. 15, 189 A. 697 (1937). In each of these cases, an individual other than the named insured presented him or herself to the insurance company in place of the purported insured individual. All these cases have a common thread; the substitution of an imposter occurred because the named insured's health status

---

7. Although Plaintiffs in no manner explain on what basis they aver that Kane was "despondent," for the purposes of this motion, the Court accepts this allegation as true.

8. Prudential also asserts that Kane misrepresented that he had been employed as a United States Government attorney for twenty years.

9. The incontestability clause in the Bankers' contract states in full,

NOT CONTESTABLE AFTER TWO YEARS:

Except for nonpayment of premiums, the validity of this Policy will not be contestable after it has been in force during the lifetime of the Insured for two years from the Date of Issue.

Similarly, the Prudential clause states

INCONTESTABILITY:

Except for non-payment of premium, we will not contest this contract after it has been in force during the Insured's lifetime for two years from the issue date.

would have precluded the issuance of a policy. The courts have uniformly rejected the applicability of the incontestability clause in these cases upon the rationale that although the insurance companies had indeed insured a "risk" of someone's life, that "risk" was not the life of the person who had been named in the policy.

After diligent research, this Court can authoritatively state that these cases are indeed few and far between. The reason is obvious. While there are many different ways a fraud can be committed upon an insurance company, it is a rare occurrence when a life insurance contract is written for a person other than an individual whom the insurance company believes it had insured. According to Plaintiffs, these cases stand for the broad proposition that life insurance contracts are void *ab initio* if there was no meeting of the minds as to the insured's "true identity."

Contrary to Plaintiffs' contention, Defendant has appropriately characterized these cases as establishing an "imposter" exception to an incontestability clause. That is, where one person is physically substituted for the named insured, the insurance company cannot be found to have insured the risk of the named insured's life. At most, the insurance company might be held to have insured the life of the imposter.

This, of course, is not the case here. Kane presented himself to both Bankers and Prudential. In fact, the policy application attached to the Complaint in the Prudential matter discloses that Kane submitted to a medical examination in June, 1980 in order to obtain the policy's coverage. Similarly, Kane's cause of death was not related to the reasons which Bankers and Prudential argue made Kane "uninsurable," i.e. the death threats Kane received as a result of his participation in the Magic Marker prosecution or his former insurance fraud. Rather, Kane's tragic end was caused by circumstances which were, on the face of these pleadings, unforseen at the time the respective applications were made.

Further support for Defendant's position is derived from the public policy underlying the inclusion of incontestability clauses in life insurance contracts.

> The incontestable clauses are enforced with particularity by the courts because of the desirable purpose which they have. It is their purpose to put a checkmate upon litigation; to prevent, after the lapse of time, an expensive resort to the courts—expensive both from the point of view of the litigants and that of the citizens of the state. In that way, it is a statute of limitations upon the right to maintain certain actions or certain defenses....

1 A. Appleman, Insurance Law and Practice, Section 311 at P. 311 (footnote omitted).

Such clauses are not the gratuitous act of insurance companies but, rather, the well-settled and accepted result of a legislative mandate which was determined only after years of debate. In Florida, the legislature has expressly required life insurance contracts to include two-year incontestability clauses, Fla.Stat. Section 627.455, and has similarly denied insurers the ability to exclude fraud from these provisions. The rationale for such clauses was succinctly summarized by the Supreme Court of Florida, when it stated that

> [s]uch a contract is not against public policy as tending to put fraud on par with honesty. On the contrary, the stipulation recognizes fraud and all other defenses, but provides a reasonable time in which they may be, but beyond which they cannot be, established.

*Prudential Ins. Co. of America v. Prescott*, 130 Fla. 11, 176 So. 875, 878 (1937). *Accord, Prudential Ins. Co. of America v. Rhodriguez*, 285 So.2d 689 (Fla.3d DCA 1973) (insurer barred from rescinding life insurance policies where insured made numerous misrepresentations regarding his health, which, if known, would have precluded insurer from issuing policy when suit filed only one day after expiration of incontestability period).[10]

---

**10.** Plaintiffs' reliance on *Guarantee Trust Life*   *Insurance Co. v. Wood,* 631 F.Supp. 15 (N.D.Ga.

The Plaintiffs' theory also does violence to a second legislative policy determination: the Federal Witness Protection Program. The basic theory behind the Witness Program is clearly documented in the Act's legislative history. As the Senate Report on the original Program, promulgated in 1970, stated,

[e]ach step in the evidence gathering process ... moves toward the production of live testimony, testimony that is necessary to bring criminal sanctions into play in the fight against organized crime. Criminal sanctions, in short, do not enforce themselves. Obtaining testimony, however, is only part of the problem. The Attorney General testified in 1965 that even after cases had been developed, it was necessary to forego prosecution hundreds of times because key witnesses would not testify for fear of being murdered. Tampering with witnesses is one of organized crime's most effective counter weapons. Indeed, the Attorney General indicated that such fear was not unjustified; he testified that the Department, in its organized crime program, lost more than 25 informants between 1961 and 1965. It was in this context, therefore, that the President's Crime Commission tragically concluded:

No jurisdiction has made adequate provision for protecting witnesses in organized crime cases from reprisal. In a few instances where guards are provided, resources require their withdrawal shortly after the particular trial terminates. On a case-to-case basis, governments have helped witnesses find jobs in other sections of the country or have even helped them to emigrate. The difficulty of obtaining witnesses because of the fear of reprisal could be countered somewhat if governments had established systems for protecting cooperative witnesses.

S.Rept. No. 617, 91st Cong., 1st Sess., 59–60, *reprinted in,* 1984 U.S.Code Cong. and Admin.News 3182, 3545.

The powers which Congress has delegated to the Attorney General are broad indeed. As the legislative history establishes

[t]he general concept is that protection of witnesses will be achieved either through relocation and the establishment of a new identity or through whatever means the Attorney General deems necessary and adequate short of relocation.

. . . .

The procedures developed by the Attorney General to implement [the Program] must be designed to protect the health, safety, and welfare of the person to be protected from bodily danger. The Attorney General is afforded *wide latitude* in taking *any* action he *deems necessary to achieve this result, and he can continue such action for long as, in his judgment, the danger continues.*

. . . .

First, the Attorney General is authorized to provide suitable official documents to enable the person relocated or protected to establish a new identity *without having to reveal his prior identity.*[*] Such documentation may include such items as birth certificates, drivers licenses, social security cards, military records, school records, *medical records,* and the like. It is expected that new names will, in most instances, be legitimized ultimately by court approved name changes.

. . . .

Second, the Attorney General is authorized to provide housing for the protected or relocated persons and, third, for transportation of persons and property to

---

1984) is of no avail. There, the Court was faced with a competing public policy of equal weight to that supporting incontestability clauses. In *Guarantee Trust,* the insured never executed the insurance contract; rather his beneficiary did so in violation of an express Georgia statute which required, at a minimum, the insured's consent. The rationale for this public policy is

simple. Ignorance of the issuance of a life insurance policy on the part of the insured could be a contributing factor toward the commission of a crime, to wit, the murder of the insured. Of course, such a result would create an unacceptable risk to innocent insured individuals. This case presents no legislatively protected competing public policy.

the new resident. In this regard the Attorney General may assist in the selection and location of a new residence and the paymment (sic) of moving expenses, and may render such other assistance as may be necessary to effect the relocation.

Fourth, the Attorney General is granted authority to provide a tax free subsistence payment in a sum to be established by him in regulations. This provision is in recognition of the need to provide funds for living expenses to a witness and his family who are suddenly removed from their existing life and employment.

. . . .

Fifth, the Attorney General is authorized to assist the person relocated in procuring employment. Here the obligation is to assist in finding job oportunities; . . . . Sixth, the Attorney General is authorized, in his discretion, *to refuse to disclose to anyone the identity, location, or any other matter concerning the person relocated or protected by the program.* Obviously, the success of a witness protection and relocation program depends on assured security as to its details. *There is no point in relocating a witness with a new identity if that identity will be made public.*

---

\* 18 U.S.C. § 1028, *the general false identification statute, is made expressly inapplicable to authorized witness protection activities, in recognition of the importance of the need in some cases to supply relocated or protected persons with new identities.*

S.Rep. No. 225, 98th Cong., 2nd Sess., 410–11, *reprinted in,* 1984 U.S.Code Cong. and Admin.News 3548–9 (footnote retained, emphasis added).

Here, Congress has eloquently spoken to the Complaints raised by Plaintiffs. To require disclosure of Kane's former identity to Plaintiffs would have undermined the very purpose of the Witness Program. Ironically, if Kane had revealed his former identity, as Plaintiffs' theory of the case requires, his life could conceivably have been more at risk, not less.

Notwithstanding this strong policy statement, Congress did recognize that special problems arise when witnesses are provided new identities.

Accordingly, Congress included in the Program a mechanism in those instances where it deemed the social cost exacted by supplying new identities to protected witnesses of such gravity as to require a legislative counter-balance. That provision deals with those citizens who have civil causes of action pending against protected witness. As Congress stated:

It is not the intent of the witness relocation and protection program to deprive otherwise innocent persons of their right to litigate civil claims for damages; however, a balance must be struck to ensure protection of the witness. Subsection (c) seeks to strike such a balance. It authorizes the Attorney General to accept the service of process on a protected person named as a defendant in a civil cause of action ensuing prior to the person's relocations. The Attorney General is required to make reasonable efforts to serve a copy of the process on the relocated person at his last known address. If a judgment is entered against the relocated person the Attorney General must determine if the person has made reasonable efforts to comply with the provisions of the judgment, and, if the person can still be located, the Attorney General is required to take affirmative steps to urge compliance by the protected person with the judgment. If the Attorney General determines that the person has failed to make reasonable efforts to comply with the judgment, he is granted discretion to reveal the identity and locations of the person to the plaintiff, after giving appropriate weight to the danger to the protected person that will be caused. Such disclosure to the plaintiff must be made upon the express condition that the plaintiff will not use that information for any purposes other than for disclosures that are essential for recovery under the judgment.

S.Rep. No. 225, 98th Cong., 2nd Sess., 411–12, *reprinted in,* 1984 U.S.Code Cong. and Admin.News 3549–50.

**1172**

Like the exception allowed for non-witnesses to maintain a cause of action against program participants, Congress could have provided for the exigency presented here. However, no such provision is made for insurance companies who issue policies based upon these new identities. Such silence is devastating to Plaintiffs' causes of action. As the relevant legal maxims dictate: *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of all others"); *exceptio firmat regulam in contrarium* ("an exception affirms the rule in cases not excepted"). Here, this Court will not enter where Congress has failed to tread. Plainly, Plaintiffs Complaints should not be directed to this tribunal, but rather, to the legislature.

 Moreover, Plaintiffs misconstrue the workings of the Witness Program. While it may of necessity make certain historical information about an individual inaccessible, it does so legally. For all practical purposes, the protected witness is the new "identity" and vice versa. Thus, the allegations of "fraud" simply cannot withstand scrutiny. The Kanes were, by law, permitted to use their new identities in order to pursue their new lives. This was the bargain which they struck with the Government and which had been authorized by statute. Therefore, critical elements of an action in fraud are missing,

most importantly, a "false" statement. *Lance v. Wade,* 457 So.2d 1008 (Fla.1984).[11]

So too, "a conspiracy is a combination of two or more persons by concerted action to accomplish an *unlawful purpose* or to accomplish some purpose, not in itself unlawful, *by unlawful means."* *Renpak, Inc. v. Oppenheimer,* 104 So.2d 642, 646 (Fla. 2d DCA 1958) (emphasis added). Here, there can be no "conspiracy" where no illegal act has been consummated nor where any of Defendant's "means or purposes" were unlawful. And in any event, the omission of information at issue cannot be seen as prejudicial where the cause of decedent's death was in no way related to the purported missing information.[12]

Because the clauses employed by Plaintiffs mean what they say, the policies became incontestable after two years. These time periods have now expired. Accordingly, for all the reasons set forth above, it is

ORDERED that the Complaints be DISMISSED with prejudice and without leave to amend or refile.[13]

---

**11.** Elements of fraud are a false statement concerning a material fact, knowledge by person making the statement that the representation is false, the intent by the person making the statement that the representation will induce another to act on it, and reliance on the representation to the injury of the other party. Not only were Kane's statements not "false" in that his new identity was legally sanctioned, but Plaintiffs fail to plead a nexus between the alleged statements and the cause of death.

**12.** In this regard, Plaintiffs' reliance upon *Unity Mutual Life Insurance Co. v. Moses,* 621 F.Supp. 13 (E.D.Pa.1985) is misplaced. The Court in *Unity Mutual* stretched the imposter exception to include a case where the insured, a physician diagnosed with terminal cancer, misrepresented his medical condition to the insurer. In his application, the insured listed a former employee at his health center as his personal physician. When the insurer's medical questionnaire concerning the insured arrived at the insured's health center, the insured intercepted the doc-

ument, filled it out stating he was in excellent health and returned it to the insurer.

*Unity Mutual* is inapposite to this matter for two significant reasons. First, the insured's action was not sanctioned by legislative mandate. Secondly, the cause of the insured's death in *Unity Mutual,* unlike here, was directly related to the false information the insured supplied.

**13.** This Court retains jurisdiction for the sole purpose of assessing costs and, if appropriate, attorneys' fees. Within twenty (20) days from the date of this Order, Mrs. Kane is directed to file her motion, if any, for costs and/or attorneys' fees. If fees are sought, Defendant shall state the bases for her request, be it contract or statute. See Fla.Stat., Section 627.428. Included with any such request should be the contract between Mrs. Kane and her attorneys; if the terms thereof are hourly, then time sheets, bills and appropriate affidavits should be submitted. If the fee arrangement is contingent, then a calculation of the requested reward should be

included. Plaintiffs shall have ten days to respond to any such motion; Mrs. Kane shall have five (5) days to reply. Because of the expedited nature of this proceeding (see foot- note 3, *supra* ) no extensions of this schedule will be considered or granted and service shall be made by hand-delivery and not by mail.