Vincent FIORETTI, Plaintiff,

v.

MASSACHUSETTS GENERAL LIFE
INSURANCE COMPANY,
Defendant.

MASSACHUSETTS GENERAL LIFE
INSURANCE COMPANY,
Counterplaintiff,

v.

Vincent FIORETTI, Counterdefendant.

No. 90–6530–CIV.

United States District Court,
S.D. Florida.

Sept. 24, 1993.

Gerald S. Lesher, West Palm Beach, FL,
for plaintiff.

Jane Mastrucci, Coral Gables, FL, Mark
F. Hughes, Robinson, St. John & Wayne,
Newark, NJ, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS CAUSE was tried without a jury before the undersigned on December 28 and 29, 1993. Plaintiff, Vincent Fioretti is the named beneficiary of a life insurance policy issued by Defendant, Massachusetts General Life Insurance Company ("Mass General") to Plaintiff's brother, Anthony Fioretti. Anthony Fioretti died in Florida on February 28, 1989, and Plaintiff made a claim for the insurance proceeds which Mass General declined. Plaintiff, by this action sues for $1,947,111.00 allegedly due under the policy. Mass General defends against the complaint and counterclaims for rescission of the policy, claiming that it was procured by fraud. Plaintiff seeks to deny this defense and defends against the counterclaim on the basis that the incontestability clause in the policy bars the defense of fraud. Plaintiff is a citizen of Florida and Defendant is incorporated in Massachusetts with its principal place of business in Colorado, and thus the action was properly removed based on diversity jurisdiction, 28 U.S.C. § 1332. Accordingly, pursuant to Fed.R.Civ.P. 52(a) the Court makes the following Findings of Fact and Conclusions of Law.

### I. *Findings of Fact*

1. In November of 1986, Anthony Fioretti applied to Columbian Mutual Life for a $100,000 life insurance policy. The application showed his correct name and his correct birthdate, September 6, 1948. Blood drawn from him in January 1987 tested HIV reactive. As a result, Columbian Mutual never issued a policy insuring Fioretti.

2. On February 10, 1987, Anthony Fioretti applied to Mass General for a life insurance policy. This time, he indicated his name as "C. Tony Fioretti" and falsely stated his date of birth as "3–6–47." D.Ex. 12. Under the heading "Requested Issue Date" he wrote "Date Policy—8/30/86." *Id.*

3. The application stated that it was "signed at Tamarac Fla., 2/10/87." *Id.* It designated the owner of the plan as "Shields & Warendorff Florist, Inc. Pension Plan." Anthony Fioretti, was the president and sole shareholder of Shields & Warendorff Florists, Inc., a florist shop located in New York, New York. It recited the residence of the insured as both New York, New York and Tamarac, Florida. The broker for the policy was Kirsner, Stern & Slavutin, Inc., located in New York, New York, and Stuart Kirsner was the agent on this application. *See* Pretrial Stip. ¶ 5. The signature of "Stuart Kirsner" appears as "Licensed Agent," but one Suzanne Kaplon–Harmon, a clerk in the broker's New York office, in fact signed Kirsner's name with the permission of Kirsner and other principals of the firm. Kaplon–Harmon never saw Fioretti sign the application, and did not know where it was signed, yet she wrote "Tamarac, Fla." as the being the place the application was signed. *See* Harmon Depo. at 16–17; Pretrial Stip. ¶ 12.

4. Although Mass General is licensed to do business in Florida, and Florida has approved the relevant policy form, Mass General refused to write the policy on the February application because the designated soliciting agent, Kirsner, was not licensed to do business in Florida.

5. In connection with the first application, Plaintiff conceded at trial that the blood of a person other than the insured was tested for AIDS in July 1987 at the Spring Medical Group in New York City. *See* D.Ex. 23. Either an impostor appeared for the blood test, or the insured somehow arranged for the substitution of another person's blood sample for his. The blood tested non-reactive to the HIV antibody.

6. On September 8, 1987, a second application was filed by Anthony Fioretti. D.Ex. 24. The application was substantially similar to the February application—proposing "C. Tony Fioretti" as the insured, again designating the Pension Plan as the owner of the policy, reiterating the false birthdate, showing the insured's residence as both New York and Florida, and requesting the policy to run retroactively from August 30, 1986. Significantly, however, this time the application indicated that it was signed in Newark, New Jersey on September 8, 1987. D. Ex. 24. Again, Susan Kaplon–Harmon, a clerk in the broker's New York office, wrote "Newark, New Jersey" on the application, although she did not know whether it had been signed

there. Pretrial Stip. at ¶ 15. As it turns out, the policy form was not approved in New Jersey, *see* Pretrial Stip. at ¶ 16, nevertheless, it was issued there.

7. Mr. Gary Yeargler, the underwriter at Mass General responsible for the Fioretti risk, testified that he relied on the negative blood test for HIV submitted in connection with the first application in approving Anthony Fioretti's second application for life insurance. Mass General relied on the results of the fraudulent blood test in issuing the subject life insurance policy, such that had Anthony Fioretti himself submitted to a blood test as Mass General required, Mass General never would have underwritten the policy.

8. Because some time had lapsed between the test and the approval of the application, Yeargler and Mass General accepted the application subject to Anthony Fioretti's executing a Statement of Good Health and Insurability. Pretrial Stip. at ¶ 17; D.Ex. 26. Anthony Fioretti signed the Statement, and Kaplon–Harmon filled in spaces indicating that the Statement was executed in New Jersey on September 25, 1987. Pretrial Stip. at ¶ 18. By that Statement, the insured represented to the best of his knowledge and belief that:

(1) I have continued in good health.

(2) I have not made an application for insurance which has been declined, postponed or modified.

(3) I have not consulted or been examined by a physician or practitioner.

D.Ex. 26.

9. At the time he signed that Statement, however, Anthony Fioretti knew that he was HIV-positive, had been declined life insurance by Columbian Mutual, and had consulted with at least two doctors about his HIV, Kaposi's sarcoma and AIDS. *See* Laubenstein Depo. at 33–34, 42–43.

10. The issued policy was backdated to August 30, 1986, as requested on both applications. Pretrial Stip. ¶ 19; D.Ex. 27, at 2 ("Notification of Participation").

11. After the policy had been approved and issued, on December 14, 1987 Anthony Fioretti applied to Mass General for an additional benefit called "Waiver of Premium." In exchange for an additional premium, this benefit provides that the insurer will not require payment of any premiums during the insured's period of total disability. The application for this benefit required that Fioretti answer the following two questions:

(4) Has the insured or any named dependent ... received advice or treatment from a physician or other medical or physical practitioner within the past three years?

(5) To the best of your knowledge and belief does the insured or any listed Dependent have any physical or mental disease or disorder?

D.Ex. 29, at 2. Anthony Fioretti checked the adjacent boxes labelled "no" to each question. Again, this was not true.

12. As a result of Fioretti's request for the additional benefit, Yeargler, on behalf of Mass General, queried the "Medical Information Bureau," an insurance company information network, about Fioretti. The resulting reports flagged the possibility of a health disorder, and as a consequence of that information, Mass General required Anthony Fioretti to submit to *another* blood test. *See* D.Ex. 30.

In April of 1988, Anthony Fioretti again somehow substituted someone else's blood, and the blood sample tested negative for the HIV antibody. *See* D.Ex. 31, 32. Yeargler relied on this report and approved the waiver of premium benefit, but it never went into effect because Fioretti did not pay the additional premium.

13. On February 28, 1989, Anthony Fioretti died in Florida. Pretrial Stip. at ¶ 27. All premiums due prior to that date had been paid. Pretrial Stip. at ¶ 28.

14. Vincent Fioretti filed a claim as the beneficiary under the insurance policy with Mass General. In December 1989, Mass General denied the claim and tendered the premiums paid to counsel for Vincent Fioretti, but the tender was rejected.

15. The issued policy contained the following clause:

**INCONTESTABILITY**

This policy will be incontestable after it has been in force during the lifetime of the

insured for 2 years from the date of issue except for non-payment of premiums. D.Ex. 27, at 13.

## II. *Conclusions of Law*

1. Since there is no dispute that HIV-negative blood was fraudulently substituted for the HIV-positive blood of the insured, and since we have found that Mass General would not have underwritten the life insurance policy had Anthony Fioretti's HIV-positive condition been revealed by the required blood test, and since we have found Anthony Fioretti made other fraudulent statements to Mass General in connection with his application, we conclude that Anthony Fioretti fraudulently induced Mass General to enter into the life insurance contract upon which the parties now sue.

2. The question to be resolved is whether the incontestability clause contained in the contract, or in the relevant state-law statutes, bars the pleading of fraud by Mass General under the facts of this case. Plaintiff argues that even accepting that Vincent Fioretti fraudulently induced the life insurance contract, Mass General is barred from raising the defense by the incontestability clause in the contract. Mass General urges us to apply the narrow "imposter exception" which has been recognized by several courts. Such an exception to the rule of incontestability would permit the insurance company to raise the defense of fraud to the enforcement of a life insurance contract, otherwise barred after the running of the contractual or statutory incontestability period, where the particular fraud alleged is that an impostor appeared for the medical examination. Plaintiff, in turn, dismisses the "impostor" defense as wholly inapplicable to his claim, reasoning that the "impostor exception" cases permitted the defense only where the impostor showed up for the insured *medical exam*. Plaintiff points out that Anthony Fioretti substituted an impostor's blood for the *blood test only;* he urges that a blood test is different from a medical exam; and therefore asks the Court to find the impostor cases inapposite.

Should this argument fail, Plaintiff maintains that state law must be applied to this case, that Florida is the correct choice of law in this case, and that Florida law—as interpreted by the United States Court of Appeals in *Bankers Security Life Ins. Soc. v. Kane*, 885 F.2d 820 (11th Cir.1989)—does not recognize an "impostor exception" to the rule of incontestability. Mass General counters this with two arguments: First, that the insurance policy was part of an ERISA plan, and therefore federal common law should be applied; Mass General reads federal common law—as derived primarily from *Maslin v. Columbian Nat. Life Ins. Co.*, 3 F.Supp. 368 (S.D.N.Y.1932)—as allowing an "impostor exception." Second, if state law applies, New York or New Jersey law govern under the correct application of choice of law principles, and both states recognize the "impostor exception." Finally, if Florida law applies, Mass General disputes *Kane*'s reading of Florida law.

3. We need not resolve the choice of law question of whether the law of New York, New Jersey or Florida governs this action, nor need we decide the issue—raised for the first time at trial—of whether the insurance policy was part of an ERISA plan such that federal common law should be here fashioned, because we find that neither New York, New Jersey nor Florida law bars proof of imposture despite the existence of an incontestability clause.

4. Incontestability clauses in life insurance policies serve the beneficent public policy of repose for insureds. They strike a balance between the ability of unscrupulous insurance companies to dangle the Damocles' sword of a belated fraud accusation over the aggrieved beneficiary, and the possibility of undeserved recovery where an insured commits fraud. The two-year period in the clauses, which are mandated by statute in all three states, allow a reasonable time for insurance companies to investigate applicants and the application process in order to uncover fraud, while cutting off possibly unconscionable post-hoc defenses. A line of caselaw and commentators have carved out a very narrow exception to this otherwise-ironclad bar: where an impostor attends the requisite medical examination because the insured's health would have precluded his insurability, the insurance companies should be able to raise imposture as a defense—regardless of

the existence of an incontestability clause—because the insurance company had actually intended to insure the life of the impostor rather than the life of the person whose name appeared atop the application. *See e.g., Obartuch v. Security Mutual Life Ins. Co.,* 114 F.2d 873 (7th Cir.1940), *cert. denied,* 312 U.S. 696, 61 S.Ct. 730, 85 L.Ed. 1131 (1941); *Unity Mutual Life Ins. Co. v. Moses,* 621 F.Supp. 13 (E.D.Pa.), *aff'd,* 780 F.2d 1015 (3d Cir.1985); *Strawbridge v. New York Life Ins. Co.,* 504 F.Supp. 824 (D.N.J.1980); *Maslin v. Columbian National Life Ins. Co.,* 3 F.Supp. 368 (S.D.N.Y.1932); *Ludwinska v. John Hancock Mutual Life Ins. Co.,* 317 Pa. 577, 178 A. 28 (1935); *Petaccio v. New York Life Ins. Co.,* 125 Pa.Super. 15, 189 A. 697 (1937); 18 Couch Cyclopedia of Insurance Law § 72:73 at 339 (2d ed. Mark S. Rhodes, 1983); 7 Couch Cyclopedia of Insurance Law § 37:330 at 922; John A. Appleman and Jean Appleman, 12 Insurance Law and Practice, § 7123 at 469–72 (1981). Essentially, these courts skirt the unambiguous mandate of the incontestability clause by reasoning that there was never any "meeting of the minds" between the insurer and the *insured;* rather, if the insurer contracted with anyone, it was with the impostor.

5. The stated motivating rationale for the exception is somewhat formalistic since falsification of the medical examination is another brand of fraudulent inducement, alongside other fraudulent statements about age, past illnesses, family history, occupation, etc. The difference between imposture and the latter types of fraud is more precisely understood not as one of kind, as the cases suggest, but rather as one of marked degree. The medical examination is the linchpin of the life insurance application. It is the determinative event for the formation of the contract. The substitution of an impostor for the insured at the medical examination is such a serious and shocking strain of fraud precisely because it is so stealthily ingenious—piercing right to the heart of the deal, and virtually impossible for the insurance company to detect through reasonable and ordinary business procedures. For this last reason, and to prevent manifest injustice, this line of authority prevents the beneficiary of an impostor's disguise from again cloaking himself—this time in the protection of the incontestability clause.

6. In sum, the incontestability clause is designed to promote stability by creating a reasonable expectation by the insured that a claim on a valid policy will be paid. Not once in the course of this litigation has Plaintiff contended that Anthony Fioretti had any reasonable expectation of payment, or that the policy was valid when it was issued. Accordingly, in this particular case, no reasonable expectations would be defeated by permitting the impostor defense. We next turn to an examination of the few cases on the subject to determine whether the law of New York, New Jersey and Florida would tolerate such an exception to the incontestability rule.

7. New York requires the inclusion of a two-year incontestability clause in all life insurance policies delivered, or issued for delivery in New York:

§ 3203. Individual life insurance policies; standard provisions as to contractual rights and responsibilities of policyholders and insurers.

(a) All life insurance policies, except as otherwise stated herein, delivered or issued for delivery in this state, shall contain in substance the following provisions, or provisions which the superintendent deems to be more favorable to policyholders:

* * * * * *

(3) that the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue ... except ... for nonpayment of premiums or violation of policy conditions relating to service in the armed forces.

N.Y.Ins. Law § 3203 (McKinney 1993).

The only court sitting in New York to have confronted the question of the impostor exception is the district court in *Maslin v. Columbian National Life Ins. Co., supra.* In that 1932 suit by the beneficiary of a life insurance contract against the insurance company that refused to honor his claim, the court struck the defense that the agent conspired with the insured to defraud the underwriter, but permitted the defendant to offer

proof of imposture. The insurance company alleged that the insured had been suffering from tuberculosis for years before his application, and in order to secure issuance of the policy, sent an impostor to the physical examination. The court, based on a canvass of analogous New York cases, found as follows:

> I think it equally clear, however, that the other defense, the alleged impersonation of Samuel Maslin by another who is said to have made the application and, more important still, to have taken the physical examination, is not barred by the incontestability clause. In substance, the defendant's position is that it never insured the life of the plaintiff's son at all and never had any dealings with him; that the man it insured was another person altogether, a healthy man whom the defendant's medical examiner saw and accepted as a risk and who chose to call himself Samuel Maslin; further, that there is nothing to show that this man is dead or that the plaintiff had any insurable interest in his life. In reality, this is not an affirmative defense at all; it may be proved under the denial that the defendant insured the life of Samuel Maslin. If the facts pleaded are borne out by the proof, the defendant is under no liability to the plaintiff. *There cannot be the slightest doubt that the person whom an insurance company intends to make a contract with and intends to insure is the person who presents himself for physical examination.*

*Maslin,* 3 F.Supp. at 369–70 (emphasis added). Admittedly, *Maslin* predates *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and thus does not necessarily construe New York state common law. We have not found any subsequent New York case on the topic; and the absence of any contrary decision by the New York court at least permits a reasonable inference that *Maslin* indicates the rule that New York would follow.

Cases cited by Plaintiff for the proposition that *Maslin* ignores New York's strict enforcement of the incontestability clause are not controlling; they confronted the more general question of whether the defense of fraud at the inception of the contract would be barred by the incontestability clause. *See Metropolitan Life Ins. Co. v. Conway,* 252 N.Y. 449, 169 N.E. 642 (1930) (Cardozo, C.J.) (holding that policy rider providing that policy shall be void if death results from non-fare-paying aircraft travel was not inconsistent with statutory incontestability rule); *Apter v. Home Life Ins. Co. of New York,* 194 N.E. 846, 847–48, 266 N.Y. 333, 337–38 (1935) (incontestability clause in health benefits policy would bar avoidance of policy based on fraudulent nondisclosure of tuberculosis, but would not bar defense that disease was not covered because it originated prior to issuance); *Spear v. The Guardian Life Ins. Co.,* 112 A.D.2d 904, 493 N.Y.S.2d 322, 324 (1985)[1].

Further, we are not persuaded that the New York State legislature has precluded such an exception. As cited above, section 3203 of N.Y.Ins. Law sets out the required incontestability clause in life insurance contracts. Section 3216 of N.Y.Ins. Law prescribes the regulations for "individual accident and health insurance policy provisions." The statute bars the use—beyond two years after the individual accident or health insurance policy was issued—of misstatements, except for fraudulent misstatements in denying a claim for loss or disability. N.Y.Ins. Law § 3216(d)(1)(B)(i). The statute further

---

1. In fact, *Spear* favors the Defendant's position. In *Spear* the insured sued for a declaratory judgment that the insurer had wrongfully terminated coverage under a group health benefits policy. The New York Supreme Court, Appellate Division, found that the incontestability clause barred counterclaims by the insurer for fraudulent representations in the application and fraudulent non-disclosure of prior injury. The court held that counterclaims alleging that the insured was not an eligible employee at the time she applied to group health policy, which counterclaims would ordinarily be inadmissible under the incontestability clause, could be litigated because "defendant alleges that during its investigation false information was provided to it by [the insured] ... to prevent defendant from commencing an action to rescind coverage under the incontestable clause." *Spear,* 493 N.Y.S.2d at 325.

Similarly, in the case at bar, Anthony Fioretti made continuing misrepresentations to the insurance company during the incontestable period which impeded defendant's discovery of the fraud: the false Statement of Good Health, *see* FF No. 8; the false Waiver of Premium application, *see* FF No. 11; and the April 1988 (second) blood test submitted to by an impostor, *see* FF No. 12.

provides that after two years from the date of issue,

> no insurer shall refuse to renew a policy of hospitalization or surgical or medical expense insurance or refuse to renew any other policy in which one-third or more of the total premium is allocable to hospital, surgical or medical expense benefits, or any combination thereof, except for one or more of the following reasons: fraud in applying for the policy or in applying for any benefits under the policy, moral hazard, overinsurance or duplication of benefits according to standards on file with the superintendent, discontinuance of a class of policies, and such other reasons, including but not limited to, the filing of false or improper claims, as the superintendent may approve....

N.Y.Ins. Law § 3216(g). The next subsection then states that "[t]his section shall not apply to or affect ... (6) Life insurance ... contracts...." N.Y.Ins. Law § 3216(h).

We do not agree with Plaintiff that the conclusion—that New York would not recognize the quite limited impostor exception—necessarily flows from the proposition that § 3216 (the individual accident and health insurance regulation section) expressly permits fraud as a defense after the running of the incontestability period, and the life insurance section does not. Simply, the two categories of policies are wholly distinguishable and involve entirely disparate methods of dealing and performance. There are strong justifications for permitting fraud defenses to non-life-insurance contracts. These justifications lose all force in the context of life insurance, with one exception: the impostor defense.

Health insurance policies—in stark contrast to life insurance policies—evince continual to-and-fro between the parties after the contract is issued: the insured becomes sick, makes a claim, part is paid, part denied; the policy runs for a limited period of time, and the insurer's risk is commensurately limited; another health exam may be ordered, and further assurances requested; the policy may be reissued, and coverage retracted or expanded. Accident insurance policies are similar: they are generally issued for a defined period; after an accident, additional premiums may be demanded for continued coverage, a new medical exam may be requested; after the policy expires, the insurer may refuse to renew. Where numerous claims are made in the course of a relationship, it would be absurd to prevent an insurance company from raising the defense that a particular claim was fraudulently manufactured simply because the policy is two-years old. Accordingly, the New York statute permits it.

Similarly, were fraud-at-the-inception barred as a defense for health and accident policies, this would bind insurance companies to the indentured position of repeatedly paying the beneficiary on a series of discrete claims where the insurance company can prove that the policy was obtained by fraud *ab initio*, and that each and every subsequent claim is fraudulent. This does not hold true for life insurance policies, which are one-shot-deals: one claim is made, and the company decides to pay or not. The possibility of subsequent claims is nonexistent. Accordingly, it is more reasonable to permit the fraud-at-the-inception defense in the context of the life insurance contract.

Likewise, it is reasonable to bar *garden-variety* fraud—as opposed to imposture—defenses after two years by the life insurance company since the possibility of a garden-variety fraud defense being raised late-in-the-game would create unseemly leverage over the life insurance beneficiary, since the alleged perpetrator of the fraud would presumably not be around to deny the charge. In contrast, in a health or accident insurance case, claims are generally made while the beneficiary is still alive, and the alleged perpetrator can appear to defend the charge since he himself is the beneficiary; accordingly, the party asserting the defense of fraud can and should be put to its proof.

A practicality of life insurance is that the insurer may only be alerted to the possibility of fraud by the nature and timing of the just-filed claim; by this time, the beneficiary no longer has the ability to call the alleged perpetrator to rebut the defense. It would thus be unfair to permit the company to raise the defense of garden-variety fraud, and accordingly, the law bars it. Following this line of reasoning, in the life insurance case

where *imposture* is alleged as a defense, the alleged perpetrator is presumably alive and susceptible to the subpoena power of the court (as, here, he was deposed), and can be required to testify to rebut the charge. Thus, it is reasonable to permit the insurer the opportunity at least to raise the defense after the incontestability period has run.

■ Thus, because health and accident insurance is so meaningfully different from life insurance, Plaintiff's argument—that the legislature's permitting fraud defenses to non-life-insurance policies shows that they could have made the same exception for life insurance, yet did not, and therefore we should conclude that New York certainly would not permit an impostor defense to a life insurance policy—is unpersuasive. In sum, we conclude that the New York courts would recognize the impostor exception.

■ 8. Similarly, we find that New Jersey recognizes an impostor exception. New Jersey's legislature has mandated an incontestability requirement similar to New York's

There shall be a provision that the policy (exclusive of provisions of the policy or any contract supplemental thereto relating to disability benefits or to additional benefits in event of death by accident or accidental means or in event of dismemberment or loss of sight) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two years from its date of issue.

N.J.Stat.Ann. § 17B:25–4 (West 1992). There appear to be no cases on point from the New Jersey state courts, but a recent decision by the district court squarely confronted the issue and clearly interpreted New Jersey law as permitting an impostor exception. *See Strawbridge v. New York Life Ins. Co.,* 504 F.Supp. 824 (D.N.J.1980).

In *Strawbridge,* the district court, on reconsideration, denied plaintiff's motion for summary judgment on his claim for death benefits under a life insurance policy, holding that the defendant life insurance company could present evidence at trial that "an impostor, not [the named insured], took the physical examination and therefore, was the

person insured by the life insurance policy in question." *Id.* at 831. The court wrote:

Although the New Jersey cases have never dealt with the issue of whether the incontestability clause bars proof of imposture, it is a well established principle of insurance law that the clause does not bar such proof. *See e.g., Maslin v. Columbian National Life Insurance Co.,* 3 F.Supp. 368 (S.D.N.Y.1932), *Petaccio v. New York Life Insurance Co.,* 125 Pa.Super. 15, 189 A. 697 (1937), 12 Appleman, *Insurance Law and Practice* § 7123.

*Id.* at 830. The court quoted at length from *Maslin,* and then observed that "[t]his rationale does not conflict with the interpretation of the incontestability clause found in the New Jersey cases and I am confident that a New Jersey court would follow it if confronted with the issue." *Id.* We are similarly confident, can find no contrary authority from New Jersey, and—following *Strawbridge*—are persuaded that the New Jersey courts would recognize the impostor exception to incontestability.

■ 9. Likewise, we find that Florida law concurs. Florida too has enacted an incontestability requirement for insurance companies:

Every insurance contract shall provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue except for nonpayment of premiums and except, at the option of the insurer, as to provisions relative to benefits in event of disability and as to provisions which grant additional insurance specifically against death by accident or accidental means.

Fla.Stat. § 627.455 (1984).

We do not think that *Bankers Security Life Ins. Society v. Kane,* 885 F.2d 820 (11th Cir.1989) controls this question. The United States Court of Appeals for the Eleventh Circuit, in *Kane,* read the practice of the Florida courts as refusing to adopt any exceptions to incontestability, in particular, "a fraud or impostor exception." *Id.* at 822. *Kane,* however, did not present the Court with a case of fraud by imposture, and thus *Kane's* interpretation of Florida law *as it relates to proof of imposture* is properly understood as dicta.

*Kane* was a suit for declaratory judgment brought by two insurance companies seeking to void a life insurance policy issued to Kane after his death. After testifying for the United States in a stock manipulation case involving organized crime figures, and after receiving death threats, Arthur Katz was included in the Federal Witness Protection Program by the Attorney General of the United States. At about the same time, Katz had pled guilty to a scheme to defraud insurance companies, and was sentenced to six months in a halfway house. Under the rubric and sanction of the Federal Witness Protection Program, Katz and his wife changed their names to Kane, relocated to Florida with new identities, social security numbers, driver's licenses, and jobs. Kane applied for two life insurance policies with the defendants, naming his wife as beneficiary, and supplying the background information to the insurance companies which the Government had concocted. Kane then amassed substantial sums from investing heavily in the stock market. On October 19, 1987, the "Black Monday" stock market crash, Kane walked into his stockbroker's offices, shot and killed the office manager, wounded his broker, and then killed himself. The insurance companies contended that the policy was void *ab initio* because (1) there was no meeting of the minds as to the particulars of Kane's application, in particular his former identity; (2) the Government's creation of his false identity precluded the companies from discovering that Kane had previously received death threats and that he had a criminal conviction for insurance fraud; and these last two facts would have resulted in the denial of his application. *See Bankers Security Life Ins. Society v. Kane,* 689 F.Supp. 1164 (S.D.Fla.1988). The district court found that the insurance companies were precluded from contesting the policies because the two-year incontestability period had run. Importantly, the district court handily dismissed as irrelevant the cases establishing the "impostor exception" where the insurance company had insured the life of the impostor, reasoning that "[t]his, of course, is not the case here" because Kane himself—not an impostor—had submitted to the medical examination, and that the cause of death was unrelated to the reasons that the insurance companies argued made Kane "uninsurable," namely, prior death threats and a criminal conviction. *Id.* at 1169.

The Court of Appeals for the Eleventh Circuit affirmed, finding that "the district court correctly held that appellants are not entitled to an exception to Florida's incontestability statute." *Kane* 885 F.2d at 822. The Court of Appeals reasoned that the Florida courts were presented with "an ideal situation" in *Prudential Ins. Co. v. Rhodriquez,* 285 So.2d 689 (Fla. 3d DCA 1973), "to create a fraud or impostor exception to the incontestability rule" and did not. *Id.* at 822. Notably, however, *Rhodriquez* was not an impostor case at all, but simply a "garden variety" fraud case where the insurer sought rescission based on the insured's "numerous misrepresentations as to his health and medical history," the truth behind which, if known, would have resulted in the rejection of the insured's application. *See Rhodriquez,* 285 So.2d at 689. The District Court of Appeals affirmed granting summary judgment in favor of the insured, holding that the incontestability clause barred the defense if brought more than two years after the policy had been in effect. Since *Kane* did not present an impostor case, and since the Eleventh Circuit Court of Appeals expressly followed *Rhodriquez*—which was not an impostor case—*Kane* cannot be fairly read to preclude our finding that the Florida courts would find an impostor exception.

Moreover, unlike here, the misrepresentations made by the insured in *Kane* were sanctioned by congressional mandate, were entirely "true" in the sense that the insured had been given a new "identity" by the Government, and thus—as the district court observed—could not possibly amount to fraud, which requires a false statement. *See Kane,* 689 F.Supp. at 1172. We also find that the justifications for permitting the impostor defense are far stronger where—unlike *Kane,* but like here—the cause of death was *directly* related to the false information supplied.

We also observe that the decision in *Home Life Ins. Co. v. Regueira,* 313 So.2d 438 (Fla. 2d DCA 1975), *cert. denied,* 328 So.2d 844 (1976), not cited by the Court of Appeals for the Eleventh Circuit in *Kane,* suggests that the Florida courts may, in some limited cir-

cumstances, be willing to abrogate the incontestability rule. In *Home Life*, the Second District Court of Appeals permitted an insurance company to defend against a claim by the beneficiary of a group life insurance policy issued to the decedent's employer, even after the expiration of the two-year period, where the rescission was based on the ground that the insured was not an employee eligible for insurance under the terms of the policy. The Court of Appeals reasoned, following the decision of *Crawford v. Equitable Life Assurance Society*, 56 Ill.2d 41, 305 N.E.2d 144 (1973), that this defense related to the limitations of coverage, and not to the validity of the policy, and that the former brand of defense was not barred by an incontestability clause.

10. Although the case for an imposter exception may be weakest under Florida law, Florida is by far the least likely choice-of-law candidate between the three. Regardless of whether we apply the doctrine of lex loci contractus, *see generally Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119 (11th Cir.1990) (suggesting that although the Florida Supreme Court has traditionally applied lex loci contractus, that Court would find the rule antiquated, and would likely take the Restatement approach); *Sturiano v. Brooks*, 523 So.2d 1126, 1129–30 (Fla.1988) (applying lex loci contractus in the limited area of automobile insurance), or—as Plaintiff urges—"most significant contacts," *see* Restatement (Second) of Conflicts of Law § 192 (1971), Florida has only the most tenuous involvement with the instant contract.[2]

■ Under lex loci contractus, we analyze the place of contracting and the place of performance. There are virtually no contacts with Florida at the time of the contracting. The most that can be said is that Florida was listed on the application, in addition to New York, as the place of the insured's residence. Importantly, under Florida law, the place of contracting is the place of the last act necessary to complete the contract. *Jemco, Inc. v. United Parcel Service, Inc.*, 400 So.2d 499, 501 (Fla. 3d DCA 1981), *rev. denied*, 412 So.2d 466 (Fla.1982); *Florida Towing Corp. v. Oliver J. Olson & Co.*, 426 F.2d 896, 900 (5th Cir.1970). Although the first application stated that it was signed in Florida, the second application *upon which the contract was formed*, states that it was signed in New Jersey. Further, an express and final condition precedent to the contract was Anthony Fioretti's signing the Statement of Good Health, which recites its place of execution as New Jersey.[3]

Place-of-performance analysis is somewhat of an anomaly in a life insurance case, but in any event, Florida's contacts with the place-of-performance are similarly dilute: the insured lived in Florida during his terminal stages, the insured died in Florida, and the beneficiary lived in Florida.

Under the Restatement approach, Florida law is no closer to prevailing. The Restatement provides:

> The validity of a life insurance contract issued to the insured upon his application and the rights created thereby are determined, in the absence of an effective choice of law by the insured in his application, by the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 192.[4] Although the question of domicile is disputed, the parties have stipulated that An-

---

2. Under *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal district court sitting in Florida must use Florida choice-of-law principles to determine the applicable law in an action grounded in state law.

3. Although Plaintiff disputes that the Statement was signed in New Jersey, pointing to the fact that the office of the broker—whose clerk, Susan Kaplon–Harmon, wrote "NJ" on the Statement—was in New York, given the strong presumption created by the document itself, the preponderance of the evidence does not support Plaintiff's contention. Either way, Plaintiff does not contend that the statement was signed in a state which we have found does not recognize an impostor exception.

4. Section 6 of the Restatement (Second) of Conflict of Laws states:

Choice-of-Law Principles

thony Fioretti owned an apartment in New York at the time of both applications and until 1988, and also owned a floral shop in New York. *See* Pretrial Stip. at ¶ 7, 8. It is clear New York State was Anthony Fioretti's domicile at the time of both applications. This factor weighs heavily in our decision that, even if Florida law were to bar proof of imposture, Florida law would not apply.

Following the language of the Restatement, "with respect to the particular issue" of the impostor defense, Plaintiff has not persuaded us that Florida has a more significant relationship to the issue than New York or New Jersey such that we should select the choice-of-law rules of the non-domicile state. Plaintiff argues that the policy form was approved only in Florida, and Mass General was licensed in Florida. Regardless of that fact, the policy was *issued* not in Florida, but rather, in New Jersey.

Next, Plaintiff urges that because Mass General is not licensed to do business in New York, and because the policy was not approved in New York, New York would have no interest in applying its laws to this contract. New York, however, certainly has an interest in preventing fraudulent conduct within its borders, especially where the fraud is carried out by one of its residents, perpetrated in manipulating unwitting third persons within the State, and through medical clinics and insurance brokers doing business in the State. *See Fleet Messenger Serv. Inc. v. Life Ins. Co. of North America,* 315 F.2d 593, 596–97 (2d Cir.1963) (applying New York law where insured and beneficiary were New York residents, although insurer was not licensed there, policy was issued in Pennsylvania, application was executed in New Jersey, and first premium was tendered in New Jersey); N.Y.Ins. Law § 1213(b)(1) (McKinney 1993) (prescribing long-arm jurisdiction over insurance companies not licensed in New York that issue or deliver policies to New York residents, or solicit New York residents, or collect premiums from New York residents).

Plaintiff further submits that New Jersey has no interest in the transaction since none of the participants in the contracting process were located in New Jersey. It is reasonable to conclude, however, that the parties intended New Jersey law to govern the contract since a concerted effort was made to designate New Jersey as the place of execution of the Statement of Good Health. As New Jersey was the location of the last act necessary to complete the contract—as evidenced by the designation of "NJ" on the Statement of Good Health and the lack of any evidence to contravene this inference—New Jersey would supply the rule of decision under the lex loci contractus approach. Because we have found that New York and New Jersey law would both likely uphold an impostor exception, it ultimately makes little difference whether the choice-of-law calculus points to New York or New Jersey as supplying the rule of decision.[5]

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue,

    (d) the protection of justified expectations,

    (e) the basic policies underlying the particular field of law,

    (f) certainty, predictability and uniformity of result,

    (g) ease in the determination and application of the law to be applied.

**5.** At trial the question of whether the insurance contract at issue was part of an ERISA plan was vigorously litigated. The issue was mentioned only once prior to trial, in a footnote to Mass General's final brief on its motion for summary judgment, *see* Reply Summ. Jmt. Brief at 6 n. 3, and appeared nowhere in the Pretrial Stipulation. Mass General argues that the life insurance policy was part of an ERISA plan, and thus federal common law—as enunciated by *Maslin*—should govern. Further, Mass General argues, a clause in the Pension Plan—which would be read together with the insurance policy if ERISA applies—expressly designates "the laws of the State in which the Employer maintains his principal place of business, to the extent not preempted by Federal law," as governing the construction of the Plan. *See* Ex. 43B at 15–2 (Pension Plan B). Plaintiff disagrees, contending that in actuality, the policy would not qualify to be an ERISA plan, since Anthony Fioretti was its only member entitled to benefits, and ERISA does not apply to single-employee plans. We find it unnecessary to reach this issue since we have found that even accepting Plaintiff's position that ERISA does not apply here and state law is *not* pre-empted, the

**11.** Because we have found that there are powerful reasons for permitting the insurer to raise the impostor defense, and that New York, New Jersey and Florida would all permit the litigation of the defense in their state courts, Mass General has properly presented a defense that an impostor appeared for Anthony Fioretti's medical examination. At trial, Plaintiff conceded the switch of blood samples. Contrary to Plaintiff's argument, we cannot find any functional distinction between a blood test for HIV and a medical examination, such that the impostor cases would be rendered irrelevant even if their rationale were accepted. Because of the particular factual matrix surrounding the insured's application in this case—namely, that the insured was flagged for possible HIV-infection—the blood test was the fulcrum of the application process. The reality of this case is that Mass General insured the person who gave the HIV-negative blood sample, that is, Mass General insured the impostor. As Mass General has successfully proven its defense of imposture, judgment must be rendered for Mass General and against the Plaintiff.

**12.** As an independent ground for our decision, Mass General has demonstrated that Anthony Fioretti made a series of fraudulent misrepresentations during the two-year period after the policy was issued, in order to conceal the substitution of his blood with that of an impostor. Specifically, he falsified the Statement of Good Health, *see* FF No. 8; he falsified the application for the waiver-of-premium benefit, *see* FF No. 11; and after Anthony Fioretti requested the waiver of premium and Mass General required another blood test, Fioretti again submitted the blood of an impostor, *see* FF No. 12. Thus, in the face of repeated and even extraordinary efforts by the insurer to root out any fraud before the expiration of the incontestability period, Anthony Fioretti answered the insurer's investigations with additional acts of fraud designed to conceal the initial imposture. It would make little sense to permit his beneficiary to reap the benefits of the incontestability bar where, throughout the running of the two-year period, the insured

repeatedly impeded the insurer's attempts to uncover the initial defects in the application. *See generally, Bornholdt v. Brady,* 869 F.2d 57, 67 (2d Cir.1989) (discussing the doctrine of equitable tolling); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258, 264 (2d Cir.1990) (same).

Accordingly, it is hereby

ORDERED AND ADJUDGED that final judgment is entered for Mass General and against Vincent Fioretti on all counts of the amended complaint, and that judgment is entered for Mass General and against Vincent Fioretti on the counterclaim.

Mass General shall submit a proposed order of final judgment within ten (10) days of the date of this order.

DONE AND ORDERED.

relevant state laws would recognize an impostor exception. If we did find that the policy was part of an ERISA plan and therefore federal

common law would supply the rule-of-decision, we would read *Maslin* as governing the decision.